**HAMPTON ROADS SHIPPING ASSO-
CIATION, on behalf of its members,
jointly and severally, Plaintiffs,**

**v.**

**INTERNATIONAL LONGSHOREMEN'S
ASSOCIATION (AFL–CIO), and its Af-
filiated Locals in the Port of Hampton
Roads, Defendants.**

Civ. A. No. 84–500–N.

United States District Court,
E.D. Virginia,
Norfolk Division.

Aug. 24, 1984.

As Corrected Aug. 27, 1984.

Braden Vandeventer, Jr., Daniel R. Weckstein, Vandeventer, Black, Meredith & Martin, Norfolk, Va., for plaintiffs.

Charles S. Montagna, C. Arthur Rutter, Breit, Rutter & Montagna, Norfolk, Va., for defendants.

## OPINION

DOUMAR, District Judge.

### I.  INTRODUCTION

Seeking a preliminary injunction, the plaintiffs brought this suit to enforce an arbitration clause in a contract between the Hampton Roads Shipping Association (HRSA) and the International Longshoremen's Association (ILA), as well as its affiliated locals in the port of Hampton Roads, Virginia.  The plaintiffs seek to require the defendants to arbitrate pursuant to the "Hampton Roads contract" while maintaining the status quo in the port, and to enjoin the defendants from striking or creating a work stoppage in Hampton Roads pending

an arbitrated determination of the issue in accordance with Sections 37 and 38 of said contract (See Exhibits 3 and 4). The underlying issue concerns the utilization of the stevedore gang on the one hand or the size of the gang on the other. It is a question of requiring more men to do the work formerly performed by less through interpretation of the contract rather than negotiation of the contract.

The defendants argue that the issue has already been arbitrated pursuant to other agreements affecting the parties, some parts of which are specifically entitled the "Master Agreement" and some parts of which are referred to from time to time as the "master contract" and which are contained in Exhibit 5 as parts: 1; 2; 3(a); 3(d); 8; and 10. The defendants contend that there is nothing left to arbitrate as they claim that an arbitration of a local grievance between the West Gulf Maritime Association and Local 20 of the ILA of Galveston, Texas conclusively decided the issue at an earlier date. According to the defendants, the resolution of the Galveston Local 20 grievance eliminated any requirement for arbitration and, therefore, any jurisdiction for arbitration in Hampton Roads. The defendants maintain that the Hampton Roads contract is at variance with the Master Agreement and that the Master Agreement takes precedence over the Hampton Roads contract. (See paragraph 5 of the answer).

In essence, the Union maintains that the final determination of the Galveston, Texas Local 20 grievance with the West Gulf Maritime Association bound each and every port association which was a party to the portion of what the Union calls the Master Contract, specifically the Work Incentive Agreement of June 19, 1981. All parties agree that there is a grievance between Hampton Roads Shipping Association and the defendants and that the agreements contain no-strike clauses. However, the defendants claim exception from the no-strike clauses by virtue of the Galveston, Texas—West Gulf mediation.

After hearing the evidence and analyzing the Hampton Roads contract and the other varied agreements between or affecting the parties, this Court has adopted the plaintiff's position requiring the defendants to proceed with the local arbitration, invoking the no-strike provisions and rejects the defendants' position for the reasons set forth herein.

The various agreements seem to create a reader's quagmire which to some may appear to have been the result of a drafter's nightmare. This Court endeavors to chart a course in the hopes that others do not sink into the many strands of quicksand that lie along the paths waiting to engulf the unwary explorer.

## II. HOW THE DISPUTE AROSE: FACTUAL BACKGROUND

The Hampton Roads Shipping Association is a multi-employer collective-bargaining association which represents the Hampton Roads maritime industry employers in their negotiations with the International Longshoremen's Association and its local affiliates. HRSA also belongs to and is a member of the Council of North Atlantic Shipping Associations.

The ILA (AFL–CIO), and its affiliated Locals in the Port of Hampton Roads, including Local 846, 970 and 1248, are all defendants and supply the stevedores or longshoremen on the vessels arriving and departing the Hampton Roads ports.

Due to the rapid growth of containerization of cargo at seaports, by 1968 maritime industry management and union representatives entered into agreements incorporating containerization rules accommodating the interests of both sides.

Initially in 1968, the agreements specified the size of the gang to be 19 men. In 1977, "the Containerization agreement" was amended to provide as follows:

5. The minimum size of the container gang used in loading or unloading containers to or from container ships shall consist of 18 men plus two drivers.

The Council of North Atlantic Shipping Associations, of which Hampton Roads Shipping Association is a member, and other shipping associations entered into contracts which adopted the same language with the Union in 1977 and in 1980 and lastly in Bal Harbour, Florida on September 26, 1983, which extended the provision to September 30, 1986 (See Exhibit 5, Part 1, pages 2 and 3; Exhibit 5, Part 3(a), paragraph 5).

Entered into in Virginia on February 2, 1984, the Hampton Roads contract contains a provision relating to the gang size which may be found at Section 50A of Exhibit 3 and Exhibit 4. The provision reads as follows:

1. GANG SIZE FOR HANDLING OF CONTAINERS .

When handling containers eighteen (18) men plus two (2) drivers will be used. The utilization and placement of the men in the gang to be at the Employer's discretion. Crane operators, whether hired by the terminal company or by the stevedore, will be counted as part of the eighteen (18) man gang.

The container gang will perform no lashing. When lashing or unlashing is required, a lashing gang, with a minimum of a header and six (6) men, will be utilized. This clause does not apply to barges. When working container or combo ships, lashing gangs will receive a 20 cents differential.[1]

(a) When holdmen are being used to stuff or unstuff containers on the dock or on deck there will be no simultaneous loading or discharging in the hatch by the gang.

(b) When carpenters are required for securing cargo, a minimum gang of a header and three men shall be employed.

The wording concerning size and utilization in the local agreement, except for the last sentence of paragraph 2 concerning the 20 cent differential, was the same for the 1977 through 1980 contract, the 1980 through 1983 contract and the 1983 through 1986 contract last negotiated on February 2, 1984.

The Union alleges in paragraph 5 of its answer that the wording of the local agreement with regard to the size of the gang "is at variance with the Master Contract which takes precedent over the local agreement."

The only agreement which the undersigned could find that made reference to the various agreements and seemingly tied the different contracts and agreements together was the agreement signed on January 26, 1984 in Miami, Florida. The Union and various steamship carriers and shipping associations including the Council of North Atlantic Shipping Associations incorporated the various agreements and provided in Articles II and III as follows in Part 2 of Exhibit 5:

II. Said Steamship Carriers by executing this Agreement hereby subscribe to and become parties to the following Agreements and any amendments thereto with the same force and effect as if said Steamship Carrier actually executed, signed and subscribed to said Agreements. Said Agreements are the following:

1. The Master Agreement first executed May 27, 1980 as thereafter amended on April 16, 1983 and on September 26, 1983. [Exhibit 5, parts 1, 2, 3(a), 3(d), 8 and 10]

2. The Management ILA Agreement dated December 6, 1980. [Exhibit 5, part 4]

3. The Resolution of March 26, 1981. [Exhibit 5, part 5]

4. The Tampa Agreement of May 4, 1981. [Exhibit 5, part 6]

5. The Charleston Agreement of May, 1981. [Exhibit 5, part 7]

6. The Work Incentive Agreement of June 19, 1981. [Exhibit 5, part 8]

---

1. The last sentence of the second paragraph concerning the 20 cent differential was added as a result of the February 2, 1984 negotiations

between the ILA and the Hampton Roads Shipping Association.

7. The Rules on Containers as now in effect and as may hereafter be amended in accordance with its terms. [Exhibit 5, part 3(d)]

8. The Containerization Agreement. [Exhibit 5, parts 3A and 10]

9. The JSP Agreement. [Exhibit 5, parts 3(c) and 9]

10. Each and every Local Agreement which may hereafter be entered into or which is presently in effect in each of said 36 ILA ports affecting the terms and conditions of employment of employees actually employed or utilized aboard the steamship vessels of said Steamship Carriers. [Exhibits 3 and 4, HRSA agreement]

III. The Steamship Carriers agree to be bound by the determination of the various management and labor tribunals named in each said Master and Local Agreements.

Any determination of the tribunal named in the Master Agreement or in any of the Local Agreements shall have the effect of an arbitration determination and may be enforced by either party in any Federal District Court having jurisdiction of the parties.

All of the contracts expire on September 30 every three years, thus, in 1977, 1980, 1983 and 1986. The negotiations generally are conducted for all contracts by an international vice president of the ILA, including the local agreements such as in Hampton Roads. The local agreements are executed on behalf of the international union by an international vice president and by the respective shipping associations.

## III. HRSA POSITION ON EVENTS

On July 25, 1984, HRSA was informed by the international vice president of the ILA that as of August 1, 1984, the ILA would no longer allow additional drivers to be taken from the 20 man cargo gang other than the two specified drivers, and further that any additional drivers would have to be added to the 20 man crew. (See Exhibit 6). This position was contrary to the understanding that existed in Hampton Roads for a minimum of at least the proceeding seven years as evidenced by the negotiations of the three local contracts for the period beginning in 1977, 1980, and 1983 as well as for the negotiations of the three so-called Master Contracts. The Union claims that the new interpretation was mandated by a resolution of a Management-ILA Emergency Panel determination relating to dispute concerning the Galveston, Texas port to be discussed later in the opinion.

HRSA immediately brought a grievance and contended that this new union labor demand constituted a strike or work stoppage under the Hampton Roads contract and sought arbitration thereunder. The pertinent contract provisions follow:

## SECTION 37

## PROHIBITION OF LOCKOUTS, STRIKES OR WORK STOPPAGES

During the life of this agreement, the party of the first part agrees there shall be no lockouts or work stoppages by the Employers, but this shall not be construed to mean a lay-off of Employees due to business conditions, and the party of the second party agrees there shall be no strikes or work stoppages by the Employees. The right of the Employees not to cross a bona fide picket line is recognized by the Employers.

In addition, said contract provides under Section 38:

## SECTION 38

## ARBITRATION CLAUSE

(a) DISPOSITION

Any grievance, dispute, complaint or claim arising out of or relating to this agreement shall be handled and disposed of in the manner hereinafter provided, and all the parties hereto agree to abide by any decision made in accordance therewith.

### (b) INTITAL PROCEDURE

On Job. When a dispute occurs, either the employer representative (Stevedore, Pier Superintendent or appropriate designate of the Employer) or Hatch Foreman or the ILA representative shall immediately call the problem to the attention of the other party. Meanwhile, work must continue. Every effort shall be made to reach a settlement consistent with the contract. If there be a failure to reach agreement, either party may immediately call for a member of the Arbitration Committee of the Hampton Roads Shipping Association and the International Vice President of ILA, AFL–CIO for the Port of Hampton Roads or his designated representative to come at once to the place of the dispute and attempt to resolve the problem.

### (c) ARBITRATION COMMITTEE ...

### (d) APPLICATION TO FEDERAL MEDIATION AND CONCILIATION SERVICE ...

On August 1, 1984, prior to the commencement of working by the first crew, the HRSA sought an on-site dispute resolution under Section (b) which ended in deadlock. Later that day, an arbitration committee (Section (c)) deadlocked as ILA representatives claimed "no jurisdiction" existed in the Hampton Roads area since, in their opinion, an Emergency Panel decision of June 12, 1984 in New York had decided the very issue in a Galveston, Texas dispute.

HRSA denied that the Emergency Panel had heard any grievance which even purported to affect Hampton Roads or that the Panel's decision in any way applied to the Hampton Roads ports. HRSA moved this Court for a preliminary injunction to require arbitration to prevent work stoppage and to stop irreparable harm to the Hampton Roads port resulting from potential economic diversion.

### IV. THE ILA POSITION

Though it had complied initially with Hampton Roads arbitration procedures by appearing, the ILA asserted that the container gang utilization problem was entirely a "Master" Agreement issue. Further, the ILA claimed that the arbitration procedures of the Master Contract governed this controversy and the use and size question was already conclusively decided by virtue of a decision concerning Galveston, Texas. The pertinent arbitration provisions of the Master Agreement are contained in the Work Incentive Agreement of June 19, 1981, which is Part 8 of Exhibit 5 and states:

6. Management, the Carriers and Direct Employers hereby re-affirm and clarify the enforcement procedures which will be followed in order to protect and preserve the work of the ILA which is covered by the said Master Agreement. The enforcement procedures shall be as follows:

A. An initial charge of alleged violation of the Containerization Agreement in the Master Agreement shall be heard under the procedures agreed upon in a local port by the local Port Association and the local representatives of the ILA. Such procedure shall be completed within ten days after the charge is filed.

B. Where there is a failure to agree on the local level, or where a party desires to appeal any decision rendered pursuant to Step One in Paragraph (1) above, such cases shall be referred to the Management-ILA Emergency Hearing Panel referred to below.

C. The Management-ILA Emergency Hearing Panel shall consist of the following members

(i) *Representing Management*

| | |
|---|---|
| NEW YORK SHIPPING ASSOCIATION, INC. | –1 |
| COUNCIL OF NORTH ATLANTIC SHIPPING ASSOCIATIONS | –1 |
| WEST GULF MARITIME ASSOCIATION | –1 |
| NEW ORLEANS STEAMSHIP ASSOCIATION | –1 |
| MOBILE STEAMSHIP ASSOCIATION | –1 |
| SOUTHEAST FLORIDA EMPLOYERS ASSOCIATION | –1 |
| SOUTH ATLANTIC EMPLOYERS NEGOTIATING COMMITTEE | –1 |
| CARRIERS | –2 |
| DIRECT EMPLOYERS | –2 |

(ii) *Representing ILA*

An equal number of ILA Vice Presidents, or other ILA representatives are to be designated by the President of the ILA.

(iii) A quorum shall consist of a majority of each side of the panel and each side of the panel shall have an equal number of votes. Each side shall have the right to designate alternates.

(iv) The decision of the panel, rendered by a majority vote thereof shall be final and binding and shall constitute an enforceable award. In the event of a deadlock by the Panel, the President of the ILA and the President of NYSA shall select (within two days of the deadlock) a third party to break the deadlock.

D. Appeals from a decision by the local port association and the ILA, under Step One, must be taken within twenty (20) days after such decision. Pending such appeal work will continue.

E. The ILA shall have the right to refuse to render service to any carrier or direct employer (but only with respect to the carrier charged) who, after a determination under Steps One or Two above, has been found to have violated the provisions of the said Master Agreement, and who refuses to abide by the decisions rendered under Steps One and Two above, and the provisions of any no-strike clause shall be rendered inapplicable in such situation.

F. Charges of alleged violations of the Master Agreement involving more than one port shall be referred directly to the Management-ILA Emergency Hearing Panel for final determination.

The Management-Union Emergency Panel mentioned, *supra*, met on June 12, 1984 in New York City to hear eleven (11) grievances which were unresolved at the local level of various ports pursuant to arbitration procedures (Sections 6(A)–(D), *supra*).

On June 7, 1984, a letter from the ILA's executive secretary added the following "grievance" to the 10-item agenda of the panel. It stated:

GALVESTON, TEXAS

Local # 20, ILA against West Gulf Maritime Association complaint that heavy lift operators (Port-O-Packer operators) are assigned out of the 20-man gang (Letters of May 22, 1984 and June 7, 1984 attached). [Defense Exhibit 5]

As can be seen, the port of Galveston, Texas was underlined in capital letters; there was no mention of "driver". Further the letter was noted to be "a grievance" ... "against West Gulf Maritime Association." As added to the minutes it provided as follows:

Min. 6. Galveston, Texas.—Local # 20, ILA against West Gulf Maritime Association complaint that heavy lift operators (Port-O-Packers) are assigned out of the 20-man gang (Letters of May 22, 1984 and June 7, 1984 attached) (Item # 6 on the Agenda).

In each instance the port is Galveston, Texas. At all times "grievance" was identified as a Local ILA Number 20 issue not a national or international one. It in no way applied to Local 846, 970 or 1248.

The Galveston Local 20 had "charged" the port of Galveston, Texas and not any other port. Evidently there was no agreement at the local level under Section (A), *supra*, and accordingly, the Emergency Panel heard the grievance. Following what can best be interpreted through the minutes as disputed dialogues, the following resolution arose from Mr. Bowers, the international vice president of the Union, who also was a negotiator at Hampton Roads:

... that the gang size shall be 18 plus two with drivers added to the twenty.

The minutes of the meeting of June 12, 1984, concerning the action of one of management's representatives, stated as follows:

Mr. Costello stated that he would abstain from voting, however, he subsequently stated he would stand by the Master Contract. This was considered a vote in favor of the Motion.

This wording by Costello was considered the winning vote in favor of the Union

because without his statement the Union would not have had the sufficient votes.

The charge made by Local 20 of the ILA against the West Gulf Maritime Association concerning the port of Galveston, Texas, on the basis of the above motion was then codified as follows:

> That in accordance with the provisions of the Master Collective Bargaining Agreement, negotiated by and agreed to by the parties, the minimum size of a container gang shall be 18 men plus two drivers and that should additional drivers be required such drivers are to be drawn from outside the gang and shall not be part of the regular 20 man gang.

## V. THE COURT'S VIEW

In making a determination as to the nature of this contract, and what has taken place, there is no requirement that either party exercise due process, but the Court notes that it was completely lacking in any alleged determination which was supposedly rendered on June 12 and 13, 1984, if indeed there was one so rendered. The Court finds as a fact that what was acted upon on June 12 and 13, 1984 by the Emergency Hearing Panel was a local grievance or charge made against the West Gulf Maritime Association concerning only the port of Galveston, Texas, a local port. No other port was listed, either in the notice or in the agenda. No other association was "charged" other than the West Gulf Maritime Association.

This Court further finds that the Hampton Roads Shipping Association has never been charged with a grievance. This Court invited the Union to charge the Hampton Roads Shipping Association with a grievance under Clause 6(A) of the Master Agreement. The ILA chose instead to rely on the Emergency Panel resolution of June 12, 1984, which supposedly solved a Galveston, Texas port problem, and no other port problem. The so-called Master Agreement gave no right to Locals 846, 970 or 1248 to engage in a work stoppage since the very wording of paragraph E of the so-called Master Contract allows refusal to render

service "only with respect to the carrier charged". Hampton Roads Shipping Association was not "charged". Neither Hampton Roads nor any of its ports such as Norfolk, Portsmouth or Newport News were charged.

## VI. CONTRACT

In analyzing the contract, the Court must apply certain stated contractual principles. The meaning of the parties must be ascertained by the terms of the writing and not by looking at a part of it. *See Boardman v. Reed,* 6 Pet. 328, 344, 31 U.S. 327, 344, 8 L.Ed. 415 (1832). Nor can the mental purpose of one of the parties to the written agreement change its terms. *See New York Central Ry. Co. v. Mohney,* 252 U.S. 152, 157, 40 S.Ct. 287, 289, 64 L.Ed. 502 (1920). Where several writings are connected by internal references to each other, even if they were executed on different dates and were not among all of the same parties, they will constitute a single contract as long as they involve the same subject matter and prove to be parts of an entire transaction. *See Gordon v. Vincent Youmans, Inc.,* 358 F.2d 261 (2d Cir.1965); *Commercial Contractors, Inc. v. U.S. Fidelity & Guaranty Co.,* 524 F.2d 944, 950 (5th Cir.1975). Moreover, it appears that any conflicting contractual provisions are to be construed with a view towards reconciliation and that interpretation and construction must be such as to reconcile clauses that might seem repugnant. *See International Erectors, Inc. v. Wilhoit Steel Erectors and Rental Service,* 400 F.2d 465, 469 (5th Cir.1968); *Papago Tribal Utility Authority v. Federal Energy Regulatory Commission,* 610 F.2d 914, 929 (D.C.Cir. Decided 1979, as amended 1980).

These principles require this Court to conclude that the Hampton Roads contract, Exhibits 3 and 4, executed by the ILA by its international vice president, dispatched from New York is on a par with all the other ILA contracts affecting the Hampton Roads Shipping Association. Counsel has pointed to no clause requiring

one contract to take precedence over another, nor has this Court found such a clause. This Court finds, indeed, that the parties to the agreement of January 25, 1984, executed in Miami, Florida, on January 26, 1984, intended to list all the agreements and give them an equivalent status. This Court finds that neither type of arbitration is superior to the other. The arbitration listed or provided by the Emergency Panel as set forth in the Work Incentive Agreement of June 19, 1981, is on a par with the arbitration provisions provided in the contract with HRSA (Exhibit 3). Moreover, the Court finds as a fact for the purposes of this opinion, on the limited evidence presented, that Paragraph 5 of the Containerization Agreement concerning the minimum size and utilization of the gang is in no way repugnant or contrary to Section 50A of the HRSA contract with ILA, Exhibit 3. They supplement one another rather than contradict.

There is no question that it had been the understanding of all the parties from at least 1977 up until at least June 12, 1984, that the utilization of the 18 men was at the employer's discretion. Thus, the employers decided whether they could be utilized as drivers. Up to 6 men had been utilized as drivers from the 20 men and this custom was known throughout the industry and other ports as the "Norfolk Agreement." This Court finds as a fact that the ILA was aware of the terms of this Norfolk Agreement, was well versed in it and had negotiated with HRSA on at least three different contracts with this Norfolk Agreement in mind. In contrast to the Norfolk Agreement, the Baltimore Agreement provided that members of the container gang perform the work of lashing and unlashing of containers from the 18 men crew while 8 men were to be holdmen in Baltimore. In Hampton Roads, a separate lashing crew of 7 men is required by the local contract. Ports to the south and ports to the north have different agreements concerning utilization of crews. All of these agreements were negotiated with the understanding that the contractual reference to "men" in the gang was to be construed as bargained for by the international vice presidents for the ILA and by the employer shipping associations in regard to the demands of particular ports and practices in these ports.

## VII. BOYS MARKETS INJUNCTION REQUISITE MET AND IRREPARABLE INJURY TO HAMPTON ROADS PORTS IMMINENT

In a labor dispute such as this, a federal district court must determine whether an injunction to enforce arbitration is proper within the dictates of *Boys Markets, Inc. v. Retail Clerks Union Local 770*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970).

In the *Boys Markets* case, the Supreme Court was required to construe the anti-injunction provisions of the Norris-LaGuardia Act, 29 U.S.C. § 104, in light of arbitration clauses enforceable under Section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a), which delineates United States district court jurisdiction in labor contract disputes. In *Boys Markets*, a strike was called which violated a collective-bargaining agreement no-strike clause which required arbitration. It held that, in such narrow circumstances, federal court injunctive action was proper to enforce and promote arbitration. The *Boys Markets* case is considered to have established three prerequisites for a federal district court's jurisdiction to enjoin a strike: (1) the strike must be in breach of a no-strike obligation under an effective collective-bargaining agreement; (2) the strike must be over an arbitrable grievance; and (3) both parties must be contractually bound to arbitrate the underlying grievance caused by the strike. *Jacksonville Maritime Association v. ILA*, 571 F.2d 319, 323 (5th Cir. 1978). Additionally, the Fifth Circuit in *Jacksonville* stated with regard to traditional injunctions, at page 322 of the opinion, as follows:

[A] preliminary injunction remains an extraordinary remedy, and the district court may exercise its discretion only within certain well-established guidelines. In every case the court must con-

clude that the movant has met four pre-requisites for this drastic remedy. These are: (1) a substantial likelihood that the movant will ultimately prevail on the merits; (2) a showing that the movant will suffer irreparable injury unless the injunction issues; (3) proof that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) a showing that the injunction, if it is issued, would not be adverse to the public interest.

Therefore, seven criteria must be reviewed by this Court to determine whether an injunction enforcing arbitration is appropriate. *Jacksonville, supra*, at 323.

Effective August 1, 1984, the ILA ordered that no more than 2 men from within the 20 man gang act as drivers in loading and unloading containers in Hampton Roads. Not only was this a complete change from prior practice, it was also a complete change from the contract provisions. Management immediately brought a grievance against the Union the same day that the Union desired to implement this rule. Under the terms of Hampton Roads contract, Section 38, the Union would be bound to follow arbitration rules as contained therein, particularly if the ILA's actions constituted a strike or work stoppage barred by Section 37 of the contract.

Since Section 37 of the Hampton Roads contract does not clearly define "strike or work stoppage", the Court referred to the definition as stated in the National Labor Relations Act, 29 U.S.C. § 142(2):

The term "strike" includes any strike or other concerted stoppage of work by employees (including a stoppage by reason of the expiration of a collective-bargaining agreement) and any concerted slow-down or other concerted interruption of operations by employees.

This Court concludes that the ILA's refusal to allow gang members from the 18 men gang to act as drivers as was previously customary constituted a strike or work stoppage in violation of this no-strike clause. In the *Jacksonville* case, the dis-

trict court utilized a similar analysis and the Fifth Circuit in affirming the lower court stated:

We cannot say that this conclusion, or the method by which the district court arrived at it, was erroneous. Certainly federal law permeates the relationships between the parties, and in the absence of specific contractual provisions the federal statutory definition is strong evidence of the understanding of the parties about the meaning of "strike." *Id.* at 323.

The Court finds that the underlying issue in this matter, that is, the composition of work gangs in Hampton Roads, was fully arbitrable under the Hampton Roads contract clause, Section 38 above, and that the parties to this cause were bound by the local contract. Hence, the dictates of the *Boys Markets* case are satisfied in this case.

As for traditional injunction requisites, the Court finds that the plaintiff HRSA would likely prevail on the merits, in that the underlying dispute is arbitrable under the Hampton Roads contract. Further, this Court believes that the balancing of hardships favors the HRSA since it merely seeks to retain the status quo that existed at the time of the requested arbitration of August 1, 1984, without a sudden change in labor requirements. The public interest certainly favors the resolution of a dispute in order to avoid a strike in a competitive seaport.

Moreover, the Agreement dated January 25, 1984 executed January 26, 1984 clearly anticipates enforcement of any "arbitration determination ... by either party in any Federal District Court having jurisdiction...." (See Roman Numeral III on Page 7 of this opinion).

Thus, the parties anticipated enforcement in a Federal District Court and, certainly, and necessarily anticipated "the enforcement" would include arbitration. This Court is merely enforcing what the parties contracted for in a court the parties anticipated such enforcement to take place.

This Court further finds as a fact that the Union exercised selective enforcement by choosing to use the ports in Norfolk or Hampton Roads. This Court finds as a factual matter that serious economic losses will cause irreparable harm to this port if allowed to continue. The ports to the north and south will gain substantial economic preference causing severe economic loss to this port.

In fact, the Court finds the elements of a traditional injunction were met and adopts its opinion of August 2, 1984. A second hearing was set to determine what the other ports were doing concerning this matter in order to determine if there was irreparable injury. At this second hearing, the Court allowed the ILA to present further evidence, but it did not change any of the reasoning set forth in its opinion of August 2, 1984, nor was the Court convinced of any reason to change its opinion previously set forth. The Hampton Roads Shipping Association was permitted to present its evidence. The Court learned that the other United States ports, from the period of time from August 1, 1984 through and including August 6, 1984, were not complying with any new ILA work gang demands. In fact, they were not even requested to comply until after the information concerning this suit was promulgated to them. Even then, Baltimore was not requested to comply until August 6th, two days before the contemplated second hearing in this matter and in a manner which does not seem possible under the Master Contract or the so-called Emergency Hearing Panel resolution. The Hampton Roads ports were used by the ILA in that it was the first port tested by the new ILA work gang issue.

The *Jacksonville* court held that "the effect of a long-term diversion of business from the port" constituted irreparable injury, and this Court finds that the same would undeniably result in Hampton Roads without the maintenance of the status quo that existed before August 1, 1984. To understand the irreparable harm Hampton Roads would suffer under the ILA position, one need only compare how the issue would effect Baltimore, Maryland just up the Chesapeake Bay. Under the local Baltimore contract, members of the container gang perform the work of lashing and unlashing of containers. In Hampton Roads, the container gang will perform no lashing when lashing or unlashing is required. A lashing gang with a minimum of a header and six men must be utilized. Thus, seven more men must be brought on the job in Hampton Roads by the local agreement to perform lashing.

It can then be easily seen that Baltimore could order four more drivers, as is the custom of some of the employers in Hampton Roads, making a crew of 24 and out of this crew of 24 have all the lashing done. In Hampton Roads, if one wanted four more drivers and had to have lashing performed, one would need a crew of 31. This would include seven more men for a period of a minimum of four hours at a cost of $35.00 per hour per man instead of three-man differential favoring Baltimore which existed on July 31, 1984.

The change of the drivers alone would cause a differentiation of $5.00 per container which for 400 containers would be $2,000.00, plus any extra charges for the lashing crew. This indeed is a substantial differentiation. Presently, the ports to the south are utilizing the Norfolk Agreement, which Norfolk itself can no longer use according to the ILA. There is no question about irreparable injury in this instance. This Court further adopts the findings of August 2, 1984, and the findings it found on August 8, 1984, and this opinion is merely an elaboration of those findings.

In conclusion, this Court finds that the ILA, under the provisions of the Hampton Roads contract, must arbitrate this issue rather than attempt to engage in a strike in Hampton Roads. ILA's reliance on the Emergency Panel determination is not well taken and this Court finds that the panel

decided a local grievance applying to the port of Galveston, Texas. This Court further finds that at no time was the Hampton Roads Shipping Association "charged" in accordance with the requirements of Clause 6(A) of the Emergency Panel arbitration provision. The mere reading of the Emergency Panel arbitration provision provides in subparagraph (E) that the "ILA shall have the right to refuse to render service to any carrier or direct employer (but only with respect to the carrier *charged*) who, after a determination under Steps 1 and 2 above, have been found to have violated the provisions ...." Third, this Court further finds that Paragraph (F) respecting "charges of alleged violations involving more than one port" does not apply because the paragraph deals only with multi-port issues and bypasses any local grievance step. The notice, the charge and the minutes all apply to Galveston, Texas. It mentioned nothing about the word "driver" but referred to "heavy lift operators" or "port-o-packer operators". At no time was there any indication of "drivers" and at no time was there any indication that any more than one port was involved. At no time was there any indication that HRSA or Norfolk, Virginia, or anything or any place or anybody other than Galveston, Texas and Union Local 20 of the ILA were involved.

This Court was assured by the ILA that it would hear this grievance on August 16, 1984 in New York before the same panel but it is unknown what was or was not done at that hearing.

Lastly, arbitration is to be preferred over litigation and that a resolution without resort to a strike benefits not only parties but also the public. The status quo of August 1, 1984 should be maintained until this problem is finally resolved. It does not appear that a further hearing in this Court would present any other evidence in conflict with that already offered and neither party has requested an immediate trial which this Court is willing to provide.