**LeMoine BAKER, Plaintiff and Appellant,**

v.

**Lavern E. WILBURN and Robert M. Steele, Defendants and Appellees.**

No. 16602.

Supreme Court of South Dakota.

Argued Nov. 27, 1989.

Decided May 16, 1990.

Rehearing Granted June 28, 1990.

Mitchell C. LaFleur of LaFleur, LaFleur & LaFleur, Rapid City, for plaintiff and appellant.

Richard E. Huffman, for defendants and appellees; John J. Delaney, Banks, Johnson, Johnson, Colbath & Huffman, Rapid City, on the brief.

SABERS, Justice.

LeMoine Baker appeals from a judgment denying his claim against Wilburn & Steele individually for payments under a business sale agreement.

### Facts

In 1972, Wendell Peden sold what was then known as the Anchor Lounge to Marlow Jurisch and his wife. The sale of the business was pursuant to an agreement which required Jurisch to make regular payments to Peden. Peden eventually assigned his seller's interest in this Peden/Jurisch agreement to the Black Hills Animal Hospital, which he controlled. In

1976, Baker purchased an undivided one-half interest in the business from Jurisch for $50,000. The Jurisch/Baker partnership was forced to move the business to a new location in early 1978 and planned to reopen the bar under the new name of Branding Iron Lounge.

The partnership encountered financial problems beginning in mid–1978, eventually causing the partners to believe the renewal of their liquor license was in jeopardy. As a result, Jurisch contacted Wilburn & Steele to see if they would be interested in investing in the Branding Iron Lounge. Wilburn & Steele attempted to purchase an interest in the business on the basis that they would have no obligation to Baker. To attempt to reach this result, Wilburn & Steele required Jurisch to obtain Baker's share of the business free and clear of any liens or encumbrances.

On November 14, 1979, Baker, Jurisch and his wife, and Wilburn & Steele entered into a series of agreements. Pursuant to these agreements, Baker transferred his interest in the business to Jurisch and his wife for $62,000, Jurisch acquired his wife's interest in the business, and Wilburn & Steele acquired fifty-one percent of the business from Jurisch for $62,000. Wilburn & Steele paid Jurisch a $25,000 down payment, $15,000 of which Jurisch paid as a down payment to Baker. At the same time, Wilburn & Steele entered into an agreement with Animal Hospital to purchase its seller's interest in the Peden/Jurisch purchase agreement.[1] Wilburn, Steele, and Jurisch then incorporated Branding Iron, Inc. with Jurisch owning forty-nine percent and Wilburn & Steele owning fifty-one percent. Jurisch was required to pledge his stock to guarantee his obligations to Wilburn & Steele, but Wilburn & Steele were not so required. As a result of these transactions, Jurisch owed Wilburn & Steele $720 a month for their purchase of the Animal Hospital's seller's interest in the business, Wilburn & Steele owed Jurisch $468.72 a month as payment towards their purchase of fifty-one percent

of the business, and Jurisch owed Baker $602.92 a month as payment for Baker's interest in the business.

The Jurisch/Baker partnership dissolution agreement and contract for sale was incorporated by reference into the Jurisch/Wilburn & Steele contract. Baker was made a secondary party to this contract because he was required to waive any security interest in the business and to indemnify Wilburn & Steele from any and all claims, demands, or causes of action brought or asserted by third parties against Wilburn & Steele arising from acts or omissions of Jurisch or Baker occurring prior to the date of possession. The Jurisch/Wilburn & Steele contract provided that the parties would establish the National Bank of South Dakota as escrow agent to receive, transfer, and make application of payments regarding the agreement and those which were due under the terms and conditions of the Jurisch/Baker contract.

In order to establish the Bank as escrow agent, Jurisch and Wilburn & Steele executed a letter of transmittal which the Bank received on April 15, 1980. That document stated that all payments into the Bank escrow account were to be credited directly to an escrow account set up by Jurisch and Baker. The Jurisch/Baker escrow account provided that all proceeds in that account were to be deposited in Baker's savings account. The Jurisch/Baker escrow account was to receive monthly payments of $602.92 from Jurisch for the purchase of Baker's interest in the business. Since the payments by Wilburn & Steele to Jurisch were automatically transferred to this escrow account, Jurisch was only required to add approximately $134 on his own to complete his monthly payment to Baker.

Payments in accordance with the agreements and the escrow accounts were regularly made through March 1982 when Wilburn, Steele, and Jurisch cancelled their escrow account. At that time, Branding Iron, Inc. agreed to assume the obligation of Wilburn & Steele to Jurisch and contin-

---

1. Wilburn & Steele acquired Animal Hospital's seller's interest in the Peden/Jurisch purchase agreement for $30,000, even though Jurisch's balance remaining thereon was $43,626.37.

ued to make payments to the Jurisch/Baker escrow account for several months. However, after November 1982, Branding Iron, Inc. ceased to make the payments. Baker instituted this action to enforce Wilburn & Steele's obligation to pay their obligation to Jurisch into the Bank escrow account. The trial court concluded that Baker did not possess enforceable rights regarding the payments Wilburn & Steele were to make to Jurisch. Baker appeals, claiming the court erred in concluding that Wilburn & Steele were not contractually obligated to make the payments into the escrow account. We reverse.

1. *All documents executed for related purposes in the same transaction must be construed together.*

 The effects and terms of a contract are questions of law to be resolved by the court. *North River Ins. Co. v. Golden Rule Constr., Inc.,* 296 N.W.2d 910, 912 (S.D.1980); *Delzer Constr. Co. v. South Dakota State Bd. of Transp.,* 275 N.W.2d 352, 355 (S.D.1979). On appeal, this court can read a contract itself without a presumption in favor of the trial court's determination. *North River, supra,* 296 N.W.2d at 912–13. The court is to enforce and give effect to the unambiguous language and terms of the contract. *GMS, Inc. v. Deadwood Social Club, Inc.,* 333 N.W.2d 442 (S.D.1983). Whether the language of a contract is ambiguous is a question of law for the court. *Enchanted World Doll Museum v. Buskohl,* 398 N.W.2d 149 (S.D. 1986). A contract is ambiguous when application of rules of interpretation leave a genuine uncertainty as to which of two or more meanings is correct. *North River, supra,* 296 N.W.2d at 913; *see also Enchanted World Doll Museum, supra,* 398 N.W.2d at 151.

 All writings that are executed together as part of a single transaction are to be interpreted together. *See Restatement (Second) Contracts* § 202 (1981). We have recognized this rule, noting that: "[W]hen two or more instruments are executed at

the same time by the same parties, for the same purpose and as part of the same transaction, the court must consider and construe the instruments as *one contract."* *GMS, supra,* 333 N.W.2d at 444 (emphasis added). Moreover, it is not critical whether the documents were executed at exactly the same time or whether the parties to each agreement were identical. As the court in *Hampton Roads Shipping Ass'n v. International Longshoremen's Ass'n,* 597 F.Supp. 709 (E.D.Va.1984), *remanded on other grounds,* 746 F.2d 1015 (4th Cir. 1984), *cert. denied,* 471 U.S. 1017, 105 S.Ct. 2022, 85 L.Ed.2d 304 (1985), *cert. denied,* 471 U.S. 1102, 105 S.Ct. 2327, 85 L.Ed.2d 845 (1985), stated:

> Where several writings are connected by internal references to each other, even if they were executed on different dates and were not among all of the same parties, they will constitute a single contract as long as they involve the same subject matter and prove to be parts of an entire transaction.

*Id.* at 716; *see also Newman–Green, Inc. v. Alfonzo–Larrain R.,* 612 F.Supp. 1434 (N.D.Ill.1985) (Agreements executed at the same time and in the course of the same transaction must be read and construed together, regardless whether the parties were identical).

 The multiple documents executed in order to change the ownership of this business cannot be separated, but must be construed together as a single contract involving the same transaction. Several factors compel the conclusion that the writings were part of a single contract or transaction. For example, the parties required the documents to be executed together at the same time and not in isolation. Wilburn & Steele's attorney testified that his clients would not have entered into the agreement if the partnership dissolution agreement was not completed. The Jurisch/Wilburn & Steele contract refers to the Jurisch/Baker contract, and Baker is included as a secondary party.[2] Moreover, Baker

---

2. The trial court concluded that Baker was a "secondary" party and as such was not entitled to enforce rights regarding Wilburn & Steele's

payments. The denomination of Baker as a "secondary" party has little or no significance. Either someone is a party or they are not.

released any security interest in the business and agreed to indemnify Wilburn & Steele against prior partnership acts as part of that agreement. The only consideration for Baker's promise is to include the other documents executed at that time within the transaction. Otherwise, Baker would receive nothing in exchange for his promise to release his security interest and the agreement would not make sense.

Wilburn & Steele argue that the following language of the Jurisch/Baker contract is determinative:

1. [Seller's] sole remedy in the event of default shall be an action for breach of contract against Marlow E. Jurisch and Seller hereby waives any right he may have to prosecute an action against Rita J. Jurisch or any assignee or transferee of this agreement or any interest herein. . . .

2. Seller does by these [promises] waive any and all liens, encumbrances, security interest, and entitlements whatsoever with regard to the subject matter of this agreement and the resulting stock of any corporate entity to which this property may be transferred and the interest of stockholders therein.

The first problem with this argument is that it misinterprets the contract language in the first quoted passage. That provision limits Baker's remedy for a default by Jurisch on his obligation to Baker. However, it does not deny Baker a breach of contract action against Wilburn & Steele for a failure to make the escrow payments.

The second problem with this argument is that it fails to consider all of the documents, specifically the disbursement instructions for the escrow proceeds. Baker expressly released his interests *in the business* as against all parties except Jurisch, but did not release his rights to the escrow payments as against any of the parties. In fact, taking all of the documents into consideration, it appears that Baker released his security interest in the business in consideration of the escrow payments. The Jurisch/Wilburn & Steele contract provides at paragraph 8.02:

LeMoine J. Baker, for and in consideration of One Dollar ($1.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, does hereby release any right, title, or interest acquired by Baker in Exhibit "B" and the property subject to this Agreement, including, but not limited to, any security interests, or any interest whatsoever acquired by contract or otherwise.

In addition, paragraph 11.05 of said contract provides in part, "All payments shall be made through Escrow Agent."

2. *The documents taken together require Wilburn & Steele to make the escrow payments for the benefit of Baker.*

■ Construing the multiple documents together, it is clear that Wilburn & Steele were obligated to make their payments to Jurisch into the Bank escrow account, and Baker, as a party to the agreement, was entitled to enforce that obligation. The Jurisch/Wilburn & Steele contract provides that the Bank as escrow agent shall receive all payments regarding the agreement and make application of payments which were due under the terms and conditions of the Jurisch/Baker contract. The effect of that provision is that all payments Wilburn & Steele made under their obligation to Jurisch were to go into that escrow account. The letter of transmittal establishing that escrow account must be consulted to determine how the payments made into that account were to be dispersed.

Both copies of the letter of transmittal submitted at trial contained statements: "Credit all payments directly to Jurisch–Baker escrow account." The trial court determined this language was added after the original typing of the letter and Wilburn & Steele had no knowledge that this language had been inserted into the letter. Even if the trial court's determination was correct, the emphasis or weight placed thereon was excessive because the contracts required the escrow accounts. Considering that the copy of the letter of transmittal coming from Steele's file contained the same instruction to credit payments to the Jurisch/Baker account, and given the

conduct of the parties with regard to the disbursement of the proceeds in accordance therewith, we conclude that the document, as part of the contract, must be interpreted and its unambiguous terms given effect. The court did not do this because it failed to determine what was to be done with the proceeds paid into the account.

The Jurisch/Wilburn & Steele account ledger card, which gave general instructions for administering the account, directed that proceeds of the account were to go to the Jurisch/Baker escrow account. The Jurisch/Baker account ledger card stated that the "documents for this escrow are held in [Jurisch/Wilburn & Steele] escrow." Although these statements are not entitled to the same weight as provisions within the contracts themselves, they indicate the connection between the two accounts, and support the same conclusion.

Wilburn & Steele's argument that the escrow accounts were established simply for the convenience of the parties makes no sense when one considers that Jurisch owed Wilburn & Steele more money than Wilburn & Steele owed Jurisch. Why would Wilburn & Steele agree to make payments of $468 per month to an escrow account for Jurisch/Baker's benefit when Jurisch owed Wilburn & Steele $720 per month? The only reasonable conclusion is that the escrow accounts were established for Baker's benefit to get him to release his interest in the business.

That the escrow accounts were mandatory is also supported in part by the Jurisch/Wilburn & Steele contract requirement that Jurisch pledge all of his stock, when Wilburn & Steele were not so required. The explanation for this inconsistency is that Baker was to benefit by Wilburn & Steele's payments rather than Jurisch, so there was no reason to protect Jurisch with a pledge of Wilburn & Steele's stock.

We also conclude that the proceeds of the escrow account were to be paid to the Jurisch/Baker escrow account because of the effect given to the letter of transmittal by the parties themselves. "The construction given by the parties themselves to the contract as shown by their acts, if reasonable, will be accorded great weight and usually will be adopted by the court." *Huffman v. Shevlin,* 76 S.D. 84, 89, 72 N.W.2d 852, 855 (1955); *see also Davis by Davis v. Outboard Marine Corp.,* 415 N.W.2d 719, 723 (Minn.Ct.App.1987).

For nearly three years, the parties to this transaction gave effect to their agreement by having the payments Wilburn & Steele owed to Jurisch be paid into the Jurisch/Wilburn & Steele escrow account, which transferred the funds to the Jurisch/Baker escrow account, which in turn transferred the funds to Baker's savings account. Indeed, Wilburn & Steele's attorney testified at trial: "Baker's funds came from the contract of sale from Jurisch to Wilburn and Steele and all the parties agreed to distribute the funds that way in the escrow." Despite Wilburn & Steele's argument that the escrow arrangement was for "convenience" only and not mandatory, their evidence fails to compel a different interpretation of the escrow account instructions. In this context, it is important to note again that Baker expressly released his security interest in the business. He did not, expressly or impliedly, release his rights to the escrow payments. To the contrary, it appears that he released his security interest in the business in consideration of the escrow payments. In fact, Baker insisted on his right to the escrow payments at all times.

We conclude that the contract entered into on November 14, 1979, by Baker, Jurisch, Wilburn & Steele required that the payments Wilburn & Steele owed to Jurisch be paid into the Bank escrow account, which was obligated to transfer the funds to the Jurisch/Baker escrow account, which, in turn, was to transfer the funds to Baker's savings account. As a party to this contract, Baker is entitled to enforce this agreement.[3]

Reversed.

---

**3.** The dissent claims this "majority opinion ... fail[s] to point out wherein the Conclusions of

Law are fatal." The obvious answer is that Conclusion of Law number 1 was in error be-

WUEST, C.J., and MORGAN and MILLER, JJ., concur.

HENDERSON, J., dissents.

HENDERSON, Justice (dissenting)

I respectfully dissent. This case was tried to the circuit court without benefit of jury. If this Court reverses this case, it must be predicated upon one of two legal assumptions: Either the Findings of Fact are clearly erroneous, *In Re Estate of Hobelsberger*, 85 S.D. 282, 181 N.W.2d 455 (1970) or the trial judge entered Conclusions of Law which are mistakes of law, *Permann v. South Dakota Dept. of Labor, Unemployment Ins. Div.*, 411 N.W.2d 113 (S.D.1987). Violating these cardinal rules on scope of review, the majority opinion has retried the case on the facts and failed to point out wherein the Conclusions of Law are fatal.

This case was not tried on an implied contract theory. There is no express contract between Baker, the Appellant, and Wilburn & Steele, the Appellees. It is too late, simply untimely, for Baker to prevail on implied contract. Thus, he must prevail upon an express contract. Baker cannot rely on any implied contract theory, which he argues in his brief, because he then argues, in contra-distinction, express contract. This cannot be under our previous holdings. *Thurston v. Cedric Sanders Co.*, 80 S.D. 426, 125 N.W.2d 496 (1963).

Baker is relying upon several express contracts. Wilburn & Steele never bought Baker's interest. Baker relies heavily on a contract labeled Exhibit 1. Nothing in that Exhibit requires Wilburn & Steele to pay Jurisch's debt to Baker. This Exhibit did not include any Escrow Letters of Transmittal. Furthermore, Baker's Exhibit 1 provides this contract "... *constitutes the sole and only agreements between them* respecting the property and the obligations of the parties." (Emphasis supplied mine).

Baker seeks to escape his own Exhibit. He is seeking to elevate an Escrow Letter of Transmittal perforce into an *implied obligation* for Wilburn & Steele to pay Jurisch's debt to him (Baker).

I am totally astounded that Appellant has not argued that the Findings of Fact were clearly erroneous or that the Conclusions of Law were mistakes of law. Appellant has three issues briefed and not one of them, in my opinion, touch upon the scope of review which must be exercised by this Court, as it reviews this case, for a determination on the legal propriety of the trial court's decision.

Before Wilburn & Steele would purchase the Branding Iron Lounge, Wilburn & Steele required Jurisch to obtain Baker's interest, free and clear of any liens or encumbrances. Wilburn & Steele insisted that a Partnership Dissolution Agreement provide for a release of all security interests and a third party release of liability from Baker. Now, to the most important part of this case. Jurisch and his wife, Rita, with Baker as a party, executed a Partnership Dissolution Agreement and Contract for Sale which contained releases. Baker sold his interest in the business to the Jurischs and waived all rights against future transferees of any interest he might have. How can Baker claim he is owed money when he signed a release? Such advocacy is legal juxtaposition at its zenith.

There was testimony below, by several witnesses, that Wilburn & Steele would not purchase this business unless Baker was completely out. Essentially, Baker is contending that payments made by Wilburn & Steele to Jurisch in escrow were for the benefit of Baker. If one reads the *contract documents*, no such promise can be found. Importantly, this trial court specifically found that Wilburn & Steele (factually) never made any representations of any kind to Baker. If I understand the transaction correctly, Baker absolutely agreed that if Jurisch did not pay him, his only recourse would be against Jurisch. Without that commitment, Wilburn & Steele would not have entered into the transaction.

On the Wilburn & Steele–Jurisch contract, LeMoine J. Baker signed as a "secondary party." He signed in two places with his own attorney acting as notary

cause the contract *did* provide Baker enforce- able rights regarding the escrow payments.

public, now deceased, Ken C. Graves. On page 2 of this agreement, Section 4.04 did express "Marlow E. Jurisch has acquired the interest of Rita J. Jurisch and LeMoine J. Baker, free and clear of any liens, encumbrances, security interest, and entitlements whatsoever...." On page 4 of this agreement, Section 8.02 Baker is certainly a part of the agreement (as I previously mentioned, he signed it twice) for it expresses:

> LeMoine J. Baker for and in consideration of One Dollar ($1.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, does hereby release any right, title, or interest acquired by Baker in Exhibit "B" and the property subject to this Agreement, including, but not limited to, any security interests, or any interest whatsoever acquired by contract or otherwise.*

Note the word "otherwise." "Otherwise" was obviously put into this agreement as a catch-all, so that it would be clearly understood by this general term, that Baker was out lock, stock, and barrel. This would include any escrow language or escrow documents which Baker (in the majority opinion) is trying to use to catapult him into a contractual relationship which he had completely signed away.

Wilburn & Steele agreed to employ the bank as an escrow agent under the terms of the Letter of Transmittal. They did not agree, by said Letter of Transmittal, to pay Jurisch's debt to Baker.

When the parties were negotiating to purchase and sell the Branding Iron Lounge (Wilburn & Steele plus Jurisch), Wilburn & Steele summarily rejected any proposals by which they would have a financial obligation to Baker. Findings of Fact XII.

Findings of Fact XXII, XXIII, and XXIV are not clearly erroneous. They provide as follows:

## XXII.

On or about November 14, 1979, Wilburn and Steele executed a Letter of Transmittal.

## XXIII.

Said Letter of Transmittal was not delivered or received by First Bank of South Dakota until April 1980.

## XXIV.

A portion of said Letter of Transmittal reads as follows:

> Payments for February and March have been paid and the account is current to April 4, 1989, credit all payments directly to Jurisch–Baker escrow account.

This language was typed at a different time and place than was the original typing of said Letter of Transmittal. Wilburn and Steele had no knowledge this language had been inserted in the Letter of Transmittal prior to or upon its delivery to the Bank.

An escrow agent cannot change the terms of a contract between parties. It can only implement the parties' intention. Wilburn & Steele should not be bound by language which was inserted, without their knowledge. The trial judge found that these terms ("Credit all payments directly to Jurisch–Baker escrow account") were added at a different time and place than the original language of the Letter of Transmittal. *The escrow agent cannot create financial obligations more extensive than those set out by contractual agreement.* He is absolutely bound by the terms and conditions of the deposit and charged with a strict execution of the duties voluntarily assumed. He is held to strict compliance per the escrow agreement. If the escrow agent violates instructions or acts negligently, he is ordinarily liable for any loss occasioned by his breach of duty. *Katleman v. U.S. Communities, Inc.,* 197 Neb. 443, 249 N.W.2d 898 (1977); *see also,* 28 Am.Jur.2d, Escrow, § 16, p. 24, and § 18, p. 27.

---

* Exhibit E reflects that Baker's sole remedy in the event of default would be an action against Jurisch. This document Baker signed but refus-es to, and cannot, collect from Jurisch as Jurisch was bankrupt. Baker, therefore, reaches out to tap the available wallet.

It is noted, by this writer, that Baker has not asserted that the findings concerning the crucial "add on" to the Letter of Transmittal are clearly erroneous. Implanted herein is a sua sponte review triggering a reversal. Spontaneity is great in the arts and athletic endeavors but it is sour tribulation to an appellate advocate. A record must be made below to protect a legal point. *Weaver v. Boortz*, 301 N.W.2d 673 (S.D.1981).

The trial court entered seven Conclusions of Law which are not mistakes of law:

## I.

Plaintiff's status as a secondary party to the Business Sale Agreement does not provide him enforceable rights regarding the payments Wilburn and Steele agreed therein to make to Jurisch.

## II.

Plaintiff has failed to meet his burden of establishing that either of the parties to the Business Sale Agreement intended to benefit him by executing such contract.

## III.

Plaintiff is not a third party beneficiary of the Business Sale Agreement.

## IV.

Plaintiff is not a creditor beneficiary of the Business Sale Agreement.

## V.

Wilburn and Steele had an absolute defense to any action by Jurisch to recover sums they agreed to pay pursuant to the Business Sale Agreement in the form of a right of offset or recoupment of the unpaid principal balance of the Animal Hospital contract. Any rights Baker may have had arising through Jurisch are extinguished by this right of offset or recoupment.

## VI.

Plaintiff has failed to meet his burden of establishing the elements of an equitable estoppel.

## VII.

Plaintiff has failed to establish facts sufficient upon which to recover for any alleged fraud. Defendants Wilburn and Steele made no untrue suggestions nor asserted any facts which were not true, nor suppressed any facts that were bound to disclose, nor made promises without intention of performing the same.

In summary, this case should be affirmed. Baker has no contractual cause of action against Wilburn & Steele for collection of Jurisch's debt and he has failed to establish that the Findings of Fact are clearly erroneous or that the Conclusions of Law are mistakes of law.