1997 SD 88

### Arlene T. TALLEY, Plaintiff and Appellee,

v.

### Harmon Anthony TALLEY, Defendant and Appellant.

### No. 19739.

Supreme Court of South Dakota.

Argued March 24, 1997.

Decided July 16, 1997.

Randall L. Macy of Buckmaster & Macy, Belle Fourche, for plaintiff and appellee.

Frank J. Driscoll of DeMersseman Jensen, Rapid City, for defendant and appellant.

MILLER, Chief Justice.

[¶ 1.] H. Anthony Talley appeals the trial court's judgment rescinding a series of contracts between him and his mother, Arlene Talley. The court also denied Anthony's counterclaim for specific performance. We affirm.

## FACTS

[¶ 2.] Donald and Arlene Talley owned a 4,300–acre ranch near Opal, South Dakota. Shortly after Donald's death, Arlene employed Anthony, their youngest son, to manage the ranch beginning in the fall of 1985. In return, he was paid a monthly wage, given an agreed number of cattle to start his own herd and provided with a mobile home. Anthony continued to manage the ranch as a cow/calf/yearling operation under this arrangement for five years.

[¶ 3.] In 1990, Anthony and Arlene discussed arrangements for Anthony to either purchase or acquire an interest in the ranch. At Arlene's suggestion, Anthony met with an attorney to discuss executing such an arrangement. The attorney drafted four contracts to allow Anthony to lease the ranch and equipment with the option to purchase, provide for grazing and care of Arlene's cattle and provide for the purchase of certain shop tools by Anthony. The contracts were executed by the parties on November 21, 1990, retroactive to November 1, 1990.

[¶ 4.] The "real estate lease" gave Anthony the right to lease the ranch for a period of ten years, from November 1, 1990, through October 31, 2000, with the option to purchase during that time for a fixed price with definite terms. Under the terms of the lease and option agreement, one-half of Anthony's lease payments would be credited to the purchase price of the ranch in the event he exercised the purchase option. The lease gave Arlene the right to use and occupy the house and garage located on the ranch rent-free.[1] In addition, the lease required the land be used for ranching purposes consistent with its past use and the buildings and

---

1. The lease also reserved all mineral rights to Arlene and required her permission before breaking additional ground for farming.

fences on the property be maintained in their current state of repair.

[¶ 5.] The "equipment lease" gave Anthony the right to lease all the equipment owned by Arlene necessary to operate the ranch. This agreement was for a term of ten years and provided Anthony the option to purchase during that term. One-half of the payments made by Anthony prior to exercising the option to purchase the equipment was to be credited to the purchase of the equipment. Pursuant to the terms of the lease, Anthony was responsible for the maintenance and repair of the equipment and Arlene was responsible for insuring the equipment. The lease specifically provided for the replacement of equipment and stated:

## VI.

That in the event, during the term of this Equipment Lease with Option to Purchase, any piece of equipment shall become unusable, stolen or destroyed, [Arlene] may, at her option, replace said equipment, which replacement equipment shall become part of this Equipment Lease with Option to Purchase.

## VII.

That in the event, during the term of this Equipment Lease with Option to Purchase, should any piece of equipment be traded in on new equipment or traded in on other equipment, the replaced equipment shall become the property of [Anthony], and [Anthony] shall be responsible to pay to [Arlene] a sum equal to the amount allowed on the trade-in of that piece of leased equipment.

The parties agreed the equipment lease would terminate in the event the real estate lease terminated for any reason.

[¶ 6.] The third instrument executed by the parties, a "grazing agreement," required Anthony to pasture and care for Arlene's cattle in exchange for sixty percent of her annual calf crop. The agreement commenced on November 1, 1990, and was to continue on a year-to-year basis for a period of ten years. No provision for the costs of wintering Arlene's 1990 calf crop was specifically included in the agreement. The grazing agreement expressly provided for its termination in the event the real estate lease terminated.

[¶ 7.] Arlene and Anthony also executed a "tool contract" for the sale of certain shop tools. Pursuant to this contract, Anthony agreed to pay Arlene $20,000 over the course of five years in exchange for the immediate possession of certain tools located on the ranch and clear and marketable title to the tools upon final payment. The tool contract was executed at the same time as the other agreements.[2]

[¶ 8.] In the fall of 1991, Arlene sold her 1990 calf crop as yearlings. She paid Anthony fifty percent of the proceeds ($35,180.82). Within two months of paying these proceeds, Arlene realized the 1990 yearlings were not provided for in the grazing agreement. She sent a letter to Anthony and spoke with him about the mistaken payment and requested it be returned. Anthony acknowledged the grazing agreement did not provide for the wintering of the 1990 calf crop but refused to return the money, claiming the payment was made pursuant to an oral agreement reached between the parties while signing the other contracts in November of 1990.

[¶ 9.] In 1992, Anthony complained about the condition of Arlene's swather. He informed her a new swather was needed but he was financially unable to purchase one. Arlene testified he convinced her to purchase a new swather by promising he would maintain her herd at one hundred head of cattle until the loan was fully paid. The new swather cost nearly $38,000 after a trade-in allowance for other equipment. Anthony failed to maintain Arlene's herd at the number promised during the duration of the loan.

[¶ 10.] In March of 1993, Anthony purchased a new baler. As part of the transaction, he traded Arlene's used baler and received a $5,500 trade-in credit. Arlene was not informed of the purchase or trade-in

---

**2.** The parties agree the tool contract was fully performed. The trial court's rulings concerning the tool contract are not at issue on appeal.

prior to the transaction. When she discovered Anthony had traded her baler, she requested the $5,500 trade-in credit. Anthony refused, but eventually paid Arlene in full without interest.[3]

[¶ 11.] Anthony purchased a new v-rake in June of 1994, and received an $800 trade-in credit for Arlene's rake. Arlene immediately requested payment for the trade-in credit but Anthony refused to pay her for "that piece of junk." Eventually, he paid Arlene in full, without interest, on October 30, 1995.[4]

[¶ 12.] Prior to 1994, the respective profits of the parties as outlined by the grazing agreement were calculated by selling the calves and yearlings and dividing the proceeds based on the average price of the animals. In 1994, however, Anthony began physically separating his percentage of calves and yearlings from Arlene's. She was not notified of the physical separation and discovered the change in practice only when she noticed Anthony separating the cattle in the summer of 1994. When she inquired as to what he was doing, he told her to leave and refused to work the cattle until she left the corral area.

[¶ 13.] That fall, Anthony separated the yearlings without informing Arlene. He separated nineteen yearlings as Arlene's and informed her he would no longer care for them. As a result, she was forced to sell the yearlings. Her neighbor purchased the yearlings but indicated they were not the same quality as previous years. Arlene confronted Anthony about the low quality of her cattle and he replied, "What did you expect to get, the best of the bunch?"

[¶ 14.] Arlene consequently requested she be notified and present for any physical separations of the cattle to ensure she received a fair representation of the herd. She subsequently received a letter informing her that Anthony planned to separate the herd for sale on October 25, 1995. She arrived at the

ranch on that date and learned the calves had been separated and shipped before she arrived. Anthony told her he changed his plans and was unable to reach her prior to the separation. He kept sixteen heifer calves and allocated eleven to Arlene. He refused to care for Arlene's cattle and she was forced to sell them.[5] Following the sale, Arlene's herd consisted of seventy-two cows and no replacement heifers.[6]

[¶ 15.] In November of 1994, Anthony unilaterally increased the fees for wintering Arlene's cattle. He sent a letter notifying her that the previously agreed price of $15 per head per month was increased to $20 per head per month. There was no discussion or agreement by the parties as to this increase.

[¶ 16.] Also that fall, Anthony and a carpenter removed the side of the mobile home provided by Arlene. The door of the mobile home, a window and a nine-to-ten-foot section of an outside wall were removed and thrown away without her knowledge. Supports were placed in the mobile home to keep the roof from collapsing. The mobile home was immovable because of the construction.

[¶ 17.] As a result of this series of events, Arlene brought suit against Anthony alleging breach of the contracts. She also sued to recover the money paid to him after the sale of her 1990 calf crop. Immediately after Arlene's commencement of her lawsuit, Anthony notified her that he was exercising his option to purchase the ranch and equipment. She refused to honor his request and he counterclaimed for specific performance and also sought to recover certain unpaid charges for wintering Arlene's calves in 1994–1995.[7]

[¶ 18.] The trial court concluded Anthony materially breached the real estate, equipment and grazing contracts and terminated the contracts. The court further concluded that Arlene mistakenly paid Anthony wintering fees after the sale of her 1990 calf crop

---

3.  Anthony testified he paid Arlene the trade-in credit because "it was getting to be a problem."

4.  Anthony's payment for the v-rake trade-in was made ten months after Arlene filed this lawsuit.

5.  Only four of the yearlings sold. The other seven did not sell because of inadequate prices.

6.  Arlene's original herd consisted of one hundred twelve cattle.

7.  The trial court denied Anthony's claim for alleged unpaid wintering fees. He has not challenged this denial on appeal.

and ordered him to pay her $20,912.82, the amount of the mistaken payment less reasonable costs for care of the cattle during the winter. The court also determined the contract to purchase the tools was completed and allowed Anthony to retain title to the tools or return them as a $20,000 credit towards the money owed Arlene. Lastly, Anthony's claim for specific performance was denied. He appeals all adverse holdings.

## STANDARD OF REVIEW

[¶ 19.] A trial court's findings of fact will not be disturbed unless they are clearly erroneous. *Jasper v. Smith*, 540 N.W.2d 399, 401 (S.D.1995); *Knudsen v. Jensen*, 521 N.W.2d 415, 418 (S.D.1994). Under this standard, we will not disturb the trial court's findings unless, after a review of all the evidence, we are firmly and definitely convinced a mistake has been made. *Cordell v. Codington County*, 526 N.W.2d 115, 116 (S.D.1994). We review conclusions of law under a *de novo* standard and give no deference to the trial court's conclusions of law. *Id.*

## DECISION

[¶ 20.] **I. Did Anthony materially breach the contracts?**

[¶ 21.] Anthony contends the trial court erred by failing to weigh the breaches alleged by Arlene against his actual performance under the agreements. He argues that individually none of the breaches are material in relation to his timely payments and his performance of a majority of the terms of each agreement. He maintains the trial court's cumulative application of the breaches of each individual agreement to support a finding of material breaches of all the agreements was in error. We disagree.

[¶ 22.] "The primary rule in the construction of contracts is that the court must, if possible, ascertain and give effect to the mutual intention of the parties." *Huffman v. Shevlin*, 76 S.D. 84, 89, 72 N.W.2d 852, 855 (1955). Another fundamental rule of construction is that all writings executed as part of a single transaction must be interpreted together. *Baker v. Wilburn*, 456 N.W.2d 304, 306 (S.D.1990). *See also* 49 AmJur2d *Landlord and Tenant* § 56 (1995); *Restatement (Second) Contracts* § 202 (1981). "[W]hen two or more instruments are executed at the same time by the same parties, for the same purpose and as part of the same transaction, the court must consider and construe the instruments as one contract." *GMS, Inc. v. Deadwood Social Club, Inc.*, 333 N.W.2d 442, 444 (S.D.1983). Writings connected by internal references to each other and involving the same subject matter constitute a single contract for the entire transaction. *Baker*, 456 N.W.2d at 306 (citing *Hampton Roads Shipping Ass'n v. International Longshoremen's Ass'n*, 597 F.Supp. 709, 716 (E.D.Va.1984), *remanded on other grounds*, 746 F.2d 1015 (4th Cir.1984), *cert. denied*, 471 U.S. 1017, 105 S.Ct. 2022, 85 L.Ed.2d 304 (1985), *cert. denied*, 471 U.S. 1102, 105 S.Ct. 2327, 85 L.Ed.2d 845 (1985).

[¶ 23.] The four contracts executed by Arlene and Anthony cannot be separated and must be considered as one contract for the entire transaction. They were executed simultaneously, by the same parties as part of a transaction to transfer an interest in the ranch, equipment and tools to Anthony and to provide for Arlene and her cattle. Arlene and Anthony agreed this was their intent in executing the contracts. The equipment lease and grazing agreement internally reference the real estate lease and provide for their termination in the event the real estate lease is terminated. Anthony acknowledged that Arlene would not have executed the real estate lease without also executing the equipment lease and grazing agreement. Therefore, we consider these instruments as one contract and, accordingly, a material breach of one aspect of the contract constitutes a material breach of the whole contract.

[¶ 24.] The trial court specifically found that Anthony materially breached the contracts by refusing to pay Arlene the appropriate trade-in credits received for her baler and v-rake in a timely fashion; physically separating the herds; refusing to care for Arlene's calves and yearlings; permanently damaging the mobile home; and engaging in a course of conduct contrary to the

intent of the executed agreements by unilaterally increasing the wintering fees. These findings have not been challenged as clearly erroneous, only as cumulative. The parties intended and the contracts contemplated that Arlene would be provided for and the family ranch would be operated as in the past. Anthony's performance did not comply with these intentions or the contractual terms. The record supports the trial court's determination that Anthony's breaches of the contracts were material, numerous, and in direct contradiction of the terms and spirit of the parties' agreement. His material breach of one aspect of the contracts constitutes a material breach of the whole contract. *See Baker*, 456 N.W.2d at 306. The trial court's determination that Anthony materially breached the contracts was not clearly erroneous.

[¶ 25] **II. Was the trial court's rescission of the real estate lease, equipment lease and grazing agreement proper?**

[¶ 26.] The trial court concluded the breaches by Anthony justified rescission of the contracts pursuant to SDCL 53–11–2(2).[8] Rescission is an equitable remedy granted in the discretion of the court. *Knudsen*, 521 N.W.2d at 420; *Jones v. Bohn*, 311 N.W.2d 211, 213 (S.D.1981). "[R]escission is not generally permitted for casual, technical, or unimportant breaches of the contract. The breach must be substantial and relate to a material part of the contract." *S & S Trucking v. Whitewood Motors, Inc.*, 346 N.W.2d 297, 300 (S.D.1984) (citing *Kary v. Arnold*, 252 N.W.2d 326, 329 (S.D.1977); *Dusek v. Reese*, 80 S.D. 96, 102, 119 N.W.2d 656, 660 (1963)).

[¶ 27.] The breaches by Anthony were not casual, technical or unimportant. The trial court concluded Anthony systematically reduced his mother's herd through physical separation, reduction in quality, and forced sales. He purposefully failed to abide by the express terms of the equipment lease, which required him to pay Arlene for any trade-in credits received on her machinery.

Additionally, he permanently damaged the mobile home and unilaterally acted to increase wintering fees for Arlene's calf crop. His numerous and material breaches of the express terms of the contracts and the spirit and intent of the contracts justified rescission of the real estate lease, equipment lease and grazing agreement in this situation. The trial court's grant of rescission was not an abuse of its discretion.

[¶ 28.] **III. Is Anthony entitled to specific performance?**

[¶ 29.] Specific performance is an equitable remedy. *Amdahl v. Lowe*, 471 N.W.2d 770, 773 (S.D.1991); *Wiggins v. Shewmake*, 374 N.W.2d 111, 115 (S.D.1985). A party seeking equity in the court must do equity, including entering the court with clean hands. *Shedd v. Lamb*, 1996 SD 117, ¶ 26, 553 N.W.2d 241, 245. "A [person] who does not come into equity with clean hands is not entitled to any relief herein, but should be left in the position in which the court finds him." *Kane v. Schnitzler*, 376 N.W.2d 337, 341 (S.D.1985) (citations and quotations omitted).

[¶ 30.] Anthony materially breached several substantial terms of the contract. He cannot now seek enforcement of those contractual provisions which benefit him when he has failed to comply with express terms as well as the intent of the parties' contracts. Anthony has not entered the court with clean hands; accordingly, he is not entitled to the equitable remedy of specific performance to compel the sale of the ranch and equipment.

[¶ 31.] **IV. Was Arlene entitled to a refund of the payment for the sale of her 1990 calf crop?**

[¶ 32.] Believing the 1990 calf crop to be governed by the agreements executed by the parties in November, 1990, Arlene paid Anthony fifty percent of the proceeds following the sale of the cattle in the fall of 1991. The trial court concluded Arlene was entitled to restitution for this payment less the reason-

---

8. SDCL 53–11–2(2) provides for the rescission of a contract "[i]f through fault of the party as to whom he rescinds, the consideration for his obligation fails in whole or in part."

able costs to Anthony for wintering the 1990 calf crop and entered judgment against Anthony for $20,912.82.

[¶ 33.] It is a general principle of equity that a party may not be unjustly enriched at the expense of another party. *Thurston v. Cedric Sanders Co.*, 80 S.D. 426, 429–30, 125 N.W.2d 496, 498 (1963). Enrichment is unjust if it is a result of money paid by mistake. *A.G. Edwards & Sons, Inc. v. Northwest Realty Co.*, 340 N.W.2d 187, 189 (S.D.1983); 66 AmJur2d *Restitution and Implied Contracts* §§ 3, 8, 118 (1973). Restitution for unjust enrichment is appropriate for "[a] person who has paid another an excessive amount of money because of an erroneous belief induced by a mistake of fact that the sum was necessary for the discharge of a duty[.]" *Restatement of Restitution* § 20 (1936).

[¶ 34.] Anthony contends Arlene is not entitled to restitution because the payment was made voluntarily, not mistakenly, pursuant to an oral agreement by the parties. He claims the oral agreement between the parties required a fifty-fifty split of the 1990 calf crop in exchange for wintering services. Anthony points to Arlene's payment of fifty percent of the total sale, not sixty percent as required by the grazing agreement, as evidence of a separate agreement concerning the 1990 calf crop. Arlene, however, testified that she believed a fifty-fifty split of the proceeds for the 1990 calf crop, rather than the sixty-forty split specified by the grazing agreement, was appropriate because Anthony was feeding her hay to the cattle.

[¶ 35.] Each party presented the trial court with a plausible theory as to the circumstances of Arlene's fifty-percent payment to Anthony. The trial court concluded she mistakenly paid half of the proceeds from the 1990 calf crop to Anthony because of her belief that the grazing agreement applied. The trial court specifically found no oral agreement existed concerning the wintering fees for the 1990 calf crop. We will not seek reasons to reverse a trial court's findings of

fact. *R & S Construction Co. v. BDL Enterprises*, 500 N.W.2d 628, 630 (S.D.1993); *Insurance Agents, Inc. v. Zimmerman*, 381 N.W.2d 218, 219 (S.D.1986). While we may not have resolved the conflicting evidence as the trial court did, we are not firmly convinced the trial court's determination that Arlene mistakenly made the payment was clearly erroneous. *In re S.A.H.*, 537 N.W.2d 1, 5 (S.D.1995).

[¶ 36.] Anthony was enriched by Arlene's mistake. He received $35,180.82 for wintering one calf crop. This payment was $20,912.82 more than his normal wintering fees for an equal number of cattle. We find no error in the trial court's determination that this enrichment was unjust. Under the circumstances of this case, the trial court's award of restitution in the amount of $20,912.82 was appropriate.[9]

[¶ 37.] Affirmed.

[¶ 38.] AMUNDSON, KONENKAMP, and GILBERTSON, JJ., concur.

[¶ 39.] SABERS, J., dissents.

SABERS, Justice (dissenting).

[¶ 40.] **THE TRIAL COURT ERRED IN REFUSING TO ALLOW ANTHONY TO EXERCISE HIS OPTION TO BUY, AS DAMAGES, IF ANY, COULD SIMPLY BE ADDED TO THE PURCHASE PRICE.**

[¶ 41.] I dissent because Anthony's actions under the contracts do not constitute material breaches warranting rescission. Rescission of a contract is governed by SDCL 53–11–2; the trial court held that subdivision (2) controlled:

> A party to a contract may rescind the same in the following cases only:
>
> . . .
>
> (2) If through fault of the party as to whom he rescinds, the consideration for his obligation fails in whole or in part;
>
> . . .

---

9. Anthony has not challenged the amount set by the trial court for wintering the 1990 calf crop as

inappropriate.

However, a rescission is permitted only for breaches which are substantial and relate to a material part of the contract:

> [R]escission of a contract is not generally permitted for a casual, technical, or unimportant breach or failure of performance, *but only for a breach so substantial as to tend to defeat the very object of the contract.* The same principle applies to rescission based upon partial failure of consideration under our statute. Such a breach must also be substantial or relate to a material part of the contract.

*Kary v. Arnold,* 252 N.W.2d 326, 329 (S.D. 1977) (emphasis added) (citations & internal quotations omitted); *accord S & S Trucking v. Whitewood Motors, Inc.,* 346 N.W.2d 297, 300 (S.D.1984). The "object" of the contract "is the thing which it is agreed, on the part of the party receiving the consideration, to do or not to do." SDCL 53-5-1. Here, the question is whether Anthony defeated the object of the contracts, which was to transfer to him an interest in the ranch, equipment, and tools and to compensate Arlene therefor.

[¶ 42.] Under the real estate lease, Anthony agreed, among other provisions, to make payments, with one-half of the payments to be credited to the purchase price of the ranch in the event he exercised the purchase option. It is not disputed that he timely made all payments. The only alleged breach of the real estate lease was the remodeling done to the mobile home. Anthony constructed a walkway between the mobile home and an existing addition. The trial court found this was a breach of the section requiring the buildings to be maintained in their current state of repair. It is unclear how this can constitute a "substantial" breach, when the mobile home was put on the property as living quarters for Anthony and the remodeling neither affected Arlene's home, nor bore any real relation to the object of the contract, i.e., for Anthony to lease the land and manage it as a ranching operation. The lease agreement did not preclude *improve-ments*[10] to the buildings *unless* they resulted in mechanic's or materialmen's liens. There is no claim that any such liens materialized. Arlene claims she was worried the remodeling would prevent a later sale because she might not be able to move the mobile home. If such a speculative and remote concern amounts to a breach, the remedy is generally damages "measured by the reasonable cost of putting the leased premises into the state of repair contemplated by the broken covenant." *Regan v. Moyle Petroleum Co.,* 344 N.W.2d 695, 697 (S.D.1984) (citations omitted).

[¶ 43.] Additionally, when a tenant exercises his option to purchase, "the lease and all its incidents, express or implied, are blotted out of existence." 49 AmJur2d *Landlord & Tenant* § 407, at 351 (1995). The mobile home was obviously part of the package, because the contract provided that Arlene would retain use of the ranch house even after Anthony became owner. Therefore, when Anthony attempted to exercise his option, any "damage" done to the mobile home ceased to be of any concern to Arlene.

[¶ 44.] The equipment lease, like the land lease agreement, provided that half of Anthony's rental payments would count toward the purchase price if he exercised his option to purchase the land and the equipment. It is not disputed that Anthony made all payments in a timely fashion. He was delinquent in remitting the trade-in credits on two pieces of equipment. Arlene's remedy in this instance was an easily ascertainable dollar amount totaling $6,300.00, plus interest. The equipment subject to the lease is worth $89,725, according to the agreed sale price. Clearly, late payment of $6,300.00, which amounts to slightly more than 7% of the total value of the equipment, does not constitute a "substantial" breach. More importantly, all such credits have since been paid. The trial court should have simply awarded interest on those delinquent payments.[11]

---

10. The majority restates Arlene's argument, i.e., that supports were placed in the mobile home to prevent the collapse of the roof; Anthony testified that the supports were temporary until a new wall could be built.

11. When asked why she did not ask Anthony for interest on the $5,500 trade-in credit on a baler, Arlene replied, "I was just satisfied that I got the fifty-five hundred." Anthony testified that Arlene attempted to return the check to him within moments of receiving it.

[¶ 45.] The decision not to amend the agreement to include the new swather was made by Arlene. Later, two other pieces of "replaced" equipment were not added to the list either. Regardless, the clear language of the contract indicates new and replaced equipment would be included and Anthony would pay rent on such equipment. The replacement equipment also became part of the machinery included in the option to purchase.

[¶ 46.] As for the grazing agreement, it is difficult to understand how the trial court found a breach of the written contract based upon the reduction in Arlene's herd. The agreement expressly provides that Arlene's herd would be reduced from the 112 in existence in November 1990:

> ... the parties contemplate that during the term of this Agreement, Arlene shall reduce her numbers with a corresponding increase in numbers by Anthony.

In fact, by Arlene's own testimony, two months prior to filing this lawsuit,[12] she still had approximately 100 head of cattle in her herd. It was not until November of 1994 that Arlene's herd fell below 100 when Anthony culled 19 bred heifers belonging to Arlene.[13] Arlene sold them to a neighbor, who paid precisely what she asked.

[¶ 47.] The second basis upon which the trial court found the grazing agreement was breached was Anthony's alleged unfair separation of the cattle, i.e., that he separated them in such a way as to give Arlene the "lower end of the stock." This allegation by Arlene pertains to the 19 bred heifers discussed above;[14] she testified that, in previous years, Anthony always kept the top end of the stock for Arlene's replacement herd. The trial court held that there was sufficient evidence to support Arlene's allegation that

these 19 were of lower quality than the heifers Anthony kept for himself. This "evidence" was Arlene's statement to that effect, coupled with her report of a neighbor's comment that the 19 heifers were not of the same quality as the year before. Anthony testified that the selection was done randomly. As the trial court is in the best position to judge the credibility of the witnesses, we do not second-guess such determinations. However, as noted, this same neighbor paid Arlene's asking price; therefore, she has not established any damages resulting from the alleged unfair separation. This clearly does not constitute a material breach of the grazing agreement.

[¶ 48.] Arlene testified that in the fall of 1991, she and Anthony agreed that she would pay him $12.00 per head per month to feed her yearlings. By mutual agreement, this amount increased to $15.00 at some later date. In December of 1994, Anthony informed Arlene the price would increase to $20.00. While Arlene may not have agreed to this, and the trial court may have been correct in concluding it was an unreasonable increase, it is *not* evidence of a breach of the *written* contract. The fee was agreed to in a collateral, *oral* agreement. Arlene continued to pay $15.00; therefore, Anthony owes no repayment to Arlene under this agreement. It was up to Anthony to collect the increased fee, which he attempted in his counterclaim.[15] Clearly, it is not evidence of a breach of the written contracts.

[¶ 49.] Even when Anthony's actions are considered as a whole, they do not constitute material breaches. Any damage suffered by Arlene can easily be compensated by monetary damages.

> In the absence of any specific provision in the contract to the contrary, a breach

---

12. Arlene hired an attorney in September of 1994 and filed suit in January of 1995; however, she testified that her decision to sue Anthony was made in June of 1994.

13. Neither the trial court's finding that Anthony "began reducing Plaintiff's cow herd in 1994 and 1995," nor the majority's statement that Anthony "systematically reduced his mother's herd" (supra ¶ 27) find support in the record.

14. There were other allegations that Anthony kept the best calves for himself but no evidence

was offered to support this claim. Additionally, despite a provision which stated the parties would bear the death loss of their own cattle, Anthony always paid Arlene for her share of calves counted at weaning even though the sale did not occur until they were yearlings, when the numbers might be reduced.

15. Anthony did not appeal the adverse ruling on this issue.

which goes to only a part of the consideration, which is incidental and subordinate to the main purpose of the contract, and which may be compensated in damages, does not warrant a rescission of the contract; the injured party is still bound to perform his part of the agreement, and his only remedy for the breach consists of the damages he has suffered therefrom.

17A AmJur2d *Contracts* § 578, at 588 (1991) (collecting cases) (footnotes omitted); *see also BankWest, N.A. v. Groseclose*, 535 N.W.2d 860, 865 (S.D.1995) ("It is a standing rule that a forfeiture shall not bind, when a thing may be done afterwards, or any compensation may be made. Forfeitures have always been considered as odious in the law.") (citation omitted).

[¶ 50.] Arlene was not entitled to rescission, and Anthony should have been granted specific performance for the options to purchase the ranch and the equipment. "[W]here there is no express condition in a lease that in order to exercise an option a lessee cannot be in default, the option to purchase could be exercised despite an asserted breach." 49 AmJur2d *Landlord & Tenant* § 427, at 367 (1995) (footnote omitted). Here, nothing in any of the contracts precluded Anthony from exercising his option to buy.

[¶ 51.] In denying specific performance, the trial court and the majority completely ignore SDCL 21–9–5, which provides: [16]

Specific performance cannot be enforced in favor of a party who has not fully and fairly performed all the conditions precedent on his part to the obligation of the other party, *except when his failure to perform is only partial, and* either entirely immaterial or *capable of being fully compensated;* in which case specific performance may be compelled, upon full compensation being made for the default.

(Emphasis added). Here, Anthony's failure to perform was "only partial" *and* "capable of being fully compensated."

[Delay in initial payment] will not defeat specific performance under SDCL 21–9–5 unless it is material. What constitutes materiality was well analyzed in Vol. 5A, *Corbin on Contracts*, § 1175, p. 304. There it is stated:

But where the plaintiff has promised a performance that constitutes part or all of the exchange for the defendant's return performance, that which he has failed to perform may be material and "of the essence" even though the parties did not expressly or impliedly make it a condition of the defendant's duty. Its essential importance, its materiality, is determined with reference to the purposes for which the contract was made, the proportion that it bears to the rest of the contract, the extent of injury that its nonperformance causes to the defendant, and the practices and feelings of the community in like cases.

Using this test we hold that the breach was not material and will not defeat a decree of specific performance. The delay was only of a 17–day duration, the amount involved was only $500 of a $112,200 contract, and the record does not reveal that the defendant was in any way injured by the late payment. What the record does reveal is that the defendant, for personal reasons, realized that he really did not want to sell his land and was using the plaintiff's delay as an excuse for repudiating the contract.

*Cook v. Rezek*, 89 S.D. 667, 671–72, 237 N.W.2d 18, 20–21 (1975).

[¶ 52.] The tests in *Cook* can be rephrased here: 1) How material are the breaches in reference to the purposes for which the contract was made? 2) What proportion do the breaches bear to the rest of the contract? 3)

**16.** The majority relies on the "clean hands" doctrine in support of its conclusion that Anthony was not entitled to specific performance, citing *Kane v. Schnitzler*, 376 N.W.2d 337, 341 (S.D. 1985) and *Shedd v. Lamb*, 1996 SD 117, 553 N.W.2d 241. *Kane* is inapposite, as the parties being denied relief were guilty of fraud. Arlene made no allegation of fraud on Anthony's part.

*Shedd* is also distinguishable, as the parties being denied the right to rescind made gross misrepresentations regarding the general well-being of their business. As SDCL 21–9–5 makes clear, one seeking specific performance is allowed that remedy even if he has not performed, to the letter, every contractual condition.

What is the extent of injury that nonperformance caused to Arlene?

[¶ 53.] First, the purpose of the contracts was to enable Anthony to manage the ranch while using existing equipment and tools, and eventually to buy the ranch and equipment if he so chose. Not one of the alleged breaches undermined this purpose. He made timely rental payments. He paid $20,000 on the tool contract, the full amount due.

[¶ 54.] Second, viewing the evidence in the light most favorable to Arlene, the breaches bear insignificant proportion to the rest of the contract. If Anthony rented the property and the equipment for the full ten-year period, he would pay $220,000.[17] If he exercised his option to buy, the total principal of the contract would be $303,225.[18] Over a 5½ year period, Anthony paid $110,000 under the lease agreements and $20,000 under the tool contract, which amount is being unduly forfeited.[19] Half of the lease payments—$55,000—would apply toward the purchase of the ranch and equipment under the option to buy. *Cf. Groseclose,* 535 N.W.2d at 865–66 ("[I]t would be unconscionable to allow repossession of this property without allowing an opportunity to cure the breach where the bulk of the contract price has been paid."). The "damage" to the 20–year old trailer was de minimis, as is any interest owed on the delinquent payment of trade-in credits on equipment. As noted, Arlene proved no damages regarding Anthony's alleged unfairness in separating the cattle. There is simply no comparison between the alleged breaches and the rest of the contract.

[¶ 55.] Third, any "injuries" suffered by Arlene are insubstantial and compensable in damages.

[¶ 56.] The fact that this mother-son relationship obviously soured should not cause a forfeiture of Anthony's option to buy. In fact, if these contracts were viewed objectively as between strangers, there is little question that the buyer would be allowed to exercise his option. Simply because Anthony apparently caused the breakdown in the relationship is insufficient reason to arbitrarily deny him his contractually unrestricted option to buy. I would reverse and remand to allow Anthony to exercise his option to buy in accordance with the contracts. Damages, if any, should be added to the purchase price.

---

17. $140,000 rent on the real property (10 years × $14,000); $60,000 rent on the equipment (10 years × $6,000); $20,000 for the tools.

18. Equipment: $89,725; tools: $20,000; land: $193,500 (4300 acres @ $45.00 per acre).

19. In addition to the substantial amount of money invested by Anthony, he had already devoted five years to management of the ranch prior to the contracts being drawn. This decision will result in a forfeiture of an investment of $130,-000 and 10½ years.