**In re TRI–STATE ETHANOL COMPANY LLC.**

**No. 03–10194.**

United States Bankruptcy Court, D. South Dakota.

Nov. 13, 2006.

Michael F. Marlow, Esq., Yankton, SD, Scott M. Perrenoud, Esq., Sioux Falls, SD, Attorneys for First Dakota National Bank.

Jerrold L. Strasheim, Esq., Omaha, NE, Terry N. Prendergast, Esq., Sioux Falls, SD, Attorneys for Tri–State Financial, LLC.

William G. Taylor, Jr., Esq., Sioux Falls, SD, Attorney for Trustee John S. Lovald.

John S. Lovald, Esq., Pierre, SD, Chapter 7 Trustee.

IRVIN N. HOYT, Bankruptcy Judge.

Dear Counsel:

The matter before the Court is the *Section 506(b) Motion for Allowance of Prepayment Charge* filed by First Dakota National Bank. This is a core proceeding under 28 U.S.C. § 157(b)(2). This letter decision and accompanying order shall

constitute the Court's findings and conclusions under Fed.Rs.Bankr.P. 7052 and 9014(c). As discussed below, First Dakota National Bank's motion will be denied under § 506(b); however, the prepayment charge will be allowed as a component of its secured claim against Debtor under 11 U.S.C. § 502(b).[1]

**Summary.** Pursuant to a May 14, 2001 business loan agreement and promissory note, First Dakota National Bank ("First Dakota") lent Debtor $9,000,000 to help finance the cost of constructing an ethanol plant in Rosholt, South Dakota. By a loan modification agreement dated February 6, 2002, the maturity date of the promissory note was extended from February 14, 2002 to March 15, 2002. On March 15, 2002, a new promissory note and mortgage were executed that converted the short-term construction loan into a long-term loan secured by the real property on which the ethanol plant was located.

With the exception of the March 15, 2002 mortgage, each of these documents included language regarding the consequences of Debtor's prepaying the loans. In particular, the May 14, 2001 business loan agreement provided:

> A prepayment charge of 2% on any unscheduled principal payments for the first seven years of the term loan in excess of the aforementioned free cash flow.[2]

The May 14, 2001 promissory note provided:

> Other than Borrower's obligation to pay any minimum interest charge, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due.

The February 6, 2002 loan modification agreement added the following provision to the May 14, 2001 promissory note:

> This loan will have a 2% prepay if paid from proceeds other than by renewal with a First Dakota term loan.

Lastly, the March 15, 2001 promissory note included the same language quoted above from the May 14, 2002 promissory note. However, it also provided:

> A prepayment charge of 2% on any unscheduled principal payments for the first seven years of the term loan in excess of the free cash flow. Free cash flow is defined in the Business Loan Agreement dated May 14, 2001.

As noted above, the March 15, 2002 mortgage did not directly address the consequences of Debtor's prepaying the loans. However, it did include a default provision:

> Lender shall have the right at its option without notice to Grantor to declare the entire indebtedness immediately due and payable, including any prepayment penalty which Grantor would be required to pay.

First Dakota had to wait less than a year to exercise its rights and remedies on default. In February 2003, it gave Debtor notice of more than a dozen alleged events of default. Sometime thereafter it accelerated the long-term loan and declared the entire principal, accrued interest, and other amounts owed to it immediately due and payable. On May 16, 2003, First Dakota commenced a foreclosure action against Debtor and others in Roberts County Circuit Court.

1. Neither the Court nor the parties recognized the distinction between First Dakota's rights under § 506(b) and § 502(b) at the time of Trustee Lovald's proposed settlement of First Dakota's motion. What impact, if any, that distinction may have had on the Court's consideration of Trustee Lovald's proposed settlement is therefore unknown.

2. The Court's efforts to identify the subject and the predicate in this provision did not bear fruit.

One week later, Debtor filed a chapter 11 petition in bankruptcy. Debtor's chapter 11 case was converted to chapter 7 on July 29, 2004. John S. Lovald was appointed the chapter 7 trustee. On November 24, 2004, First Dakota filed an amended proof of claim and noted thereon that its claim "include[d a] $175,188.81 prepayment charge." No party in interest has objected to First Dakota's claim.

By order entered February 15, 2005, Trustee Lovald was authorized to pay First Dakota the principal amount of its fully secured claim plus interest to the date of payment.[3] Trustee Lovald did not request authority—and the Court did not give him authority—to pay First Dakota its attorneys' fees or any other fees, costs, or charges that might be allowable under 11 U.S.C. § 506(b). The question of whether First Dakota was entitled to be paid any such additional sums was reserved. By its *Section 506(b) Motion for Allowance of Prepayment Charge*, First Dakota now seeks payment of the prepayment charge referenced in the May 14, 2001 business loan agreement, the February 6, 2002 loan modification agreement, the March 15, 2002 promissory note, and the March 15, 2002 mortgage.[4]

Tri–State Financial, LLC ("Tri–State Financial") and Trustee Lovald objected to First Dakota's motion. At the evidentiary hearing on First Dakota's motion, the Court heard the testimony of Dan Swanda ("Swanda"), a business development officer for Bank of the West and a former officer of First Dakota; Wayne Williamson ("Williamson"), a Vice-president of First Dakota; and Trustee Lovald. The Court also received numerous exhibits, including the five documents described above. Following the submission of briefs, the matter was taken under advisement.

**Section 506(b).** First Dakota brought its motion under 11 U.S.C. § 506(b), which provides:

> To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

11 U.S.C. § 506(b).

An analysis of § 506(b) "begins where all such inquiries must begin: with the language of the statute itself." *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989). Nothing in § 506(b) suggests it is intended to govern the allowance of interest, fees, costs, and other charges arising pre-petition. To the contrary, the plain language of § 506(b) limits its applicability to interest, fees, costs, and other charges arising post-petition.

> The relevant phrase in [§ 506(b)] is "there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose." 11 U.S.C. § 506(b). "Such claim" refers to the "allowed secured claim" to the extent it is oversecured. *Id.* Thus, the starting point in the application of that section is the existence of "an allowed secured claim," which is determined by looking to applicable law. 11 U.S.C. §§ 506(b), 502(b)(1). A "claim" includes "any right

---

3. The funds with which Trustee Lovald paid First Dakota, other secured creditors, and the Internal Revenue Service, were generated by Trustee Lovald's sale of the ethanol plant.

4. By separate motion, First Dakota has also sought payment of its attorneys' fees.

to payment...." 11 U.S.C. § 101(5). The plain language of § 506(b) does not limit the definition of an "allowed secured claim" to include only the principal amount due. Rather, the "allowed secured claim" referred to in [§ 506(b)] necessarily includes the principal as well as any interest and fees for which the creditor has a right to payment as of the time the bankruptcy petition is filed. *See* 11 U.S.C. § 502(b) (providing that the amount of the claim be determined as of the date of the filing of the petition). Section 506(b) then provides that a creditor may collect certain postpetition additions to the extent that its "allowed secured claim" is oversecured. Under this analysis, because [the creditor's] right to payment of the [fee] matured before the filing of Debtor's bankruptcy petition, the fee is part of the underlying secured claim, the allowability of which is determined under § 502. Thus, § 506(b) has no bearing on the allowability of the [fee].

*In re Leatherland Corp.*, 302 B.R. 250, 258 (Bankr.N.D.Ohio 2003).

This Court agrees with the reasoning of the court in *Leatherland* and others that have held § 506(b) applies only to interest, fees, costs, and other charges accruing post-petition. *See, e.g., In re CP Holdings, Inc.*, 332 B.R. 380 (W.D.Mo.2005) (affirming the decision of the bankruptcy court that § 506(b) did not apply to a prepayment premium that became due and owing prior to the bankruptcy filing), *aff'd*, *CP Holdings, Inc. v. California Public Employees Retirement System (In re CP Holdings, Inc.)*, 2006 WL 3203751, slip op. at 1 (8th Cir. Nov. 7, 2006);[5] *In re Nunez*, 317 B.R. 666, 670 (Bankr.E.D.Pa.2004) ("[S]ection 506(b) applies only to *post-petition* interest, fees, and costs sought as part

of a secured claim."); *In re Aguilar*, 312 B.R. 394, 398 (D.Ariz.2003) ("While *post-petition* charges, including penalties, may be included in a secured claim only as authorized by section 506(b), *pre-petition* charges, including penalties, are properly included as part of the secured claim."); *In re Vanderveer Estates Holdings, Inc.*, 283 B.R. 122, 131 (Bankr.E.D.N.Y.2002) ("Interest, fees, costs and charges arising pre-petition are part of the secured creditor's claim in the first instance, and are therefore not governed by § 506(b)."); and *In re Cummins Utility, L.P.*, 279 B.R. 195, 201 (Bankr.N.D.Tex.2002) ("[B]ecause [§ 506(b)] refers to interest and 'reasonable fees, costs or charges' which may be added to an 'allowed secured claim,' it relates only to postpetition accretions."). This interpretation is also consistent with the Supreme Court's treatment of § 506(b).

> Section 506(b) allows a holder of an oversecured claim to recover, *in addition to the pre-petition amount of the claim*, "interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose."

*Ron Pair Enterprises, Inc.*, 489 U.S. at 239–40, 109 S.Ct. at 1029 (emphasis added). *See also Rake v. Wade*, 508 U.S. 464, 468, 471, 113 S.Ct. 2187, 2190–91, 124 L.Ed.2d 424 (1993) (*modified on other grounds by* 11 U.S.C. § 1322(e) as adopted in 1994); and *United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 371, 108 S.Ct. 626, 630, 98 L.Ed.2d 740 (1988).

In this case, First Dakota's claim for the prepayment charge arose pre-petition. First Dakota declared the entire principal, accrued interest, and other amounts owed

---

**5.** In its decision, the Court of Appeals for the Eighth Circuit "assum[ed] without deciding that section 506(b)" applied to a prepayment premium that became due and owing prior to the filing of the debtor's bankruptcy petition.

to it immediately due and payable sometime between February 2003 and May 16, 2003, and in any event, prior to the filing of Debtor's petition on May 23, 2003. Pursuant to the March 15, 2002 mortgage, the total sum due and payable included the prepayment charge. Thus, the Court agrees with Tri–State Financial that First Dakota's claim for the prepayment charge was "frozen" as of the petition date. First Dakota's claim for that charge must therefore be determined under § 502(b), not § 506(b).

**Section 502(b).** If a party in interest objects to a claim, "the court, after notice and a hearing, shall determine the amount of such claim ... as of the date of the filing of the petition ..." 11 U.S.C. § 502(b). While no party in interest has objected to First Dakota's claim, in the interests of judicial economy, the Court will treat Tri–State Financial's and Trustee Lovald's objections to First Dakota's motion as objections to that portion of First Dakota's secured claim that represents the prepayment charge of $173,253.27 sought by First Dakota in its motion. For the same reason, First Dakota's August 11, 2005 notice of its motion and the hearing thereon satisfy § 502(b)'s procedural requirement of "notice and a hearing."

■ With nine enumerated exceptions, the Court must allow a claim in the amount it determines was due and owing on the date the petition was filed. 11 U.S.C. § 502(b). Only one of those exceptions is relevant in this case. A court may not allow a claim to the extent it "is unenforceable against the debtor and property of the debtor, under any agreement or

applicable law for a reason other than because such claim is contingent or unmatured." 11 U.S.C. § 502(b)(1).[6]

■ Both Tri–State Financial and Trustee Lovald argued the prepayment charge is not enforceable. The majority of their arguments can be summed up as follows: the loan documents are ambiguous regarding First Dakota's entitlement to the prepayment charge; the prepayment charge is not enforceable under South Dakota law; and the prepayment charge is unreasonable.

■ With respect to the alleged ambiguity, the longstanding and "primary rule in the construction of contracts is that the court must, if possible, ascertain and give effect to the mutual intention of the parties." *Huffman v. Shevlin,* 76 S.D. 84, 89, 72 N.W.2d 852, 855 (1955) (citations omitted).

> If the intention of the parties is not clear from the writing, then it is necessary and proper for the court to consider all the circumstances surrounding the execution of the writing and the subsequent acts of the parties.

*Ibid.* (citations omitted). *See also Talley v. Talley,* 566 N.W.2d 846, 851 (S.D.1997) (quoting *Huffman* ). Put another way, "when there is an ambiguous contract, evidence must be introduced to determine what the intentions of the parties were[.]" *Delzer Construction Co. v. South Dakota State Board of Transportation,* 275 N.W.2d 352, 355 (S.D.1979) (citations omitted). *See also Vollmer v. Akerson,* 688 N.W.2d 225, 229 (S.D.2004); and *North River Insurance Company v. Golden Rule Construction, Inc.,* 296 N.W.2d 910, 912

---

**6.** A second exception was implicated by Tri–State Financial's objection to First Dakota's motion. A court may not allow a claim to the extent it is for unmatured interest. 11 U.S.C. § 502(b)(2). However, Tri–State Financial did not pursue that objection at the evidentia-ry hearing or in its post-trial briefs and will therefore be deemed to have abandoned it. In any event, the prepayment charge was fully due and owing on the date Debtor filed its petition. Thus, it cannot represent unmatured interest.

(S.D.1980) (both quoting *Delzer Construction Co.*). Lastly, "[a]nother fundamental rule of construction is that all writings executed as part of a single transaction must be interpreted together." *Talley,* 566 N.W.2d at 851.

In this case, the March 15, 2002 promissory note is internally inconsistent and thus ambiguous. On one hand, it permitted Debtor to "pay without penalty all or a portion of the amount owed earlier than it is due." On the other, it provided for "[a] prepayment charge of 2% on any unscheduled principal payments for the first seven years of the term loan in excess of the free cash flow." To further complicate matters, the latter provision is a sentence fragment, as noted above. Nevertheless, for the several reasons discussed below, the Court finds First Dakota and Debtor intended to provide for the prepayment charge.

First, with the exception of the May 14, 2001 promissory note, the various loan documents all refer to a prepayment charge. Tri–State Financial and Trustee Lovald based their argument only on the March 15, 2002 promissory note. However, that promissory note is not a stand-alone document and must be read in conjunction with the other loan documents. Read together, the loan documents clearly evidence First Dakota's and Debtor's intent to provide for a prepayment charge.

Second, Swanda testified First Dakota and Debtor discussed and agreed to a prepayment charge during the negotiations leading up to their financial dealings. That testimony was never disputed or qualified.

Third, First Dakota's March 19, 2001 commitment letter, which provided the framework for First Dakota's and Debtor's subsequent financial dealings, specifically provided for "[a] prepayment charge of 2% on any unscheduled principal payments for the first seven years of the term loan in excess of ... free cash flow." Debtor accepted and agreed to the terms and conditions outlined in the commitment letter on March 23, 2001.

Fourth, while the May 14, 2001 promissory note did not originally include a prepayment charge, First Dakota and Debtor added a provision for such a charge when the maturity date of that promissory note was extended by the February 6, 2002 loan modification agreement. At that point, the May 14, 2001 promissory note arguably suffered from the same internal consistency as the March 15, 2002 promissory note. However, First Dakota and Debtor clearly intended to provide for a prepayment charge.

Fifth, the May 14, 2001 promissory note and the March 15, 2002 promissory note are virtually identical, with the exception of three paragraphs, including the one providing for the prepayment charge, that appear in the March 15, 2002 promissory note but not the May 14, 2001 promissory note. By adding those paragraphs, First Dakota and Debtor again evidenced their intent to provide for a prepayment charge.

Finally, no one offered any evidence Debtor did not intend the loan documents to provide for a prepayment charge. Given all the foregoing evidence of First Dakota's and Debtor's intent to provide for such a charge, the absence of any evidence that Debtor intended otherwise is telling.

With respect to whether the prepayment charge is enforceable under South Dakota law, Tri–State Financial and Trustee Lovald both cited *American Federal Savings and Loan Association of Madison v. Mid–America Service Corporation,* 329 N.W.2d 124 (S.D.1983). In that case, the court held a lender could not both accelerate the maturity of a note upon a sale of mortgaged property and collect a premium or penalty for prepayment.

The instant case, however, differs from *American Federal* in one significant aspect. In *American Federal,* while the mortgage provided for a prepayment charge, the mortgage's due-on-sale clause did not reference that prepayment charge:

> If there shall be any change in the ownership of the premises, covered hereby, without the consent of the Mortgagee, the entire principal and all accrued interest shall become due and payable at the election of the mortgagee and foreclosure proceedings may be instituted thereon.

*American Federal,* 329 N.W.2d at 125. In contrast, Debtor's March 15, 2002 mortgage specifically referenced the prepayment charge in the provision outlining First Dakota's rights and remedies on default:

> Lender shall have the right at its option without notice to Grantor to declare the entire indebtedness immediately due and payable, *including any prepayment penalty which Grantor would be required to pay.*

[Emphasis added.]

In other words, unlike the lender and the borrower in *American Federal,* First Dakota and Debtor specifically agreed in the event of a default, the total sum due and owing would include the prepayment charge. Nothing in *American Federal* suggests the South Dakota Supreme Court would refuse to enforce such an agreement and thereby deny the lender the benefit of its bargain.

Neither Tri–State Financial nor Trustee Lovald has pointed the Court to—and the Court has not found—any other authority that would support their position that the prepayment charge is not enforceable un-der South Dakota law. Accordingly, the Court concludes that agreement is enforceable under South Dakota law.

In its post-trial brief, Tri–State Financial did argue the prepayment charge was a "penalty and invalid" under South Dakota law, but it did not offer any authority for that proposition.[7] Nevertheless, the Court has reviewed S.D.C.L. § 53–9–5, which provides:

> Every contract in which amount of damage or compensation for breach of an obligation is determined in anticipation thereof is void to that extent except the parties may agree therein upon an amount presumed to be the damage for breach in cases where it would be impracticable or extremely difficult to fix actual damage.

Swanda and Williamson testified regarding the difficulty in accurately forecasting interest rates—and thus the loss First Dakota might suffer as a result of a prepayment—and the manner in which First Dakota arrived at the 2% figure. Williams further testified to the relationship between the prepayment charge and First Dakota's probable loss. That testimony was never disputed or qualified. Thus, to the extent the prepayment charge is in fact a liquidated damages clause, the Court concludes it is enforceable under § 53–9–5. *See BankWest, N.A. v. Groseclose,* 535 N.W.2d 860 (1995).

With respect to whether the prepayment charge is reasonable, nothing in the plain language of § 502(b) imposes a requirement that it be reasonable, except to the extent such a requirement may be subsumed by § 502(b)(1)'s requirement that a claim be enforceable under applicable law, which was addressed above.

---

**7.** Neither of the cases cited by Tri–State Financial in its discussion regarding liquidated damages dealt with a prepayment charge. *In re Direct Transit, Inc.,* 226 B.R. 198 (8th Cir. BAP 1998), involved an employment contract, which the court upheld. *BankWest, N.A. v. Groseclose,* 535 N.W.2d 860 (1995), involved a forfeiture clause in a contract for deed, which the court did not uphold.

*Compare* 11 U.S.C. § 506(b); *see CP Holdings, Inc.*, 332 B.R. at 392. Neither Tri–State Financial nor Trustee Lovald has pointed the Court to—and the Court has not found—any authority imposing a reasonableness requirement under South Dakota law.[8]

Tri–State Financial, but not Trustee Lovald, argued First Dakota was not entitled to the prepayment charge because First Dakota failed to offer evidence Trustee Lovald's payment of that portion of First Dakota's secured claim representing principal and accrued interest was not in excess of "Free Cash Flow" as defined by the loan documents. However, as noted above, the prepayment charge became due and owing sometime prior to the filing of Debtor's petition on May 23, 2003, when First Dakota exercised its rights and remedies on *default.* Because no actual prepayment was made, no such proof was required.[9]

The Court will enter an appropriate order.

---

**8.** The present record nonetheless indicates the prepayment charge was reasonable. The only evidence offered by any party on this issue was the testimony of Swanda and Williamson. They both testified the prepayment charge was reasonable and in line with industry standards. Neither Tri–State Financial nor Trustee Lovald offered any evidence to the contrary.

**9.** Tri–State Financial also argued "[t]he claim of First Dakota is not equitable." However, it offered no case law or other authority in support of this proposition. Thus, the Court is not persuaded to reach a different decision regarding First Dakota's entitlement to the prepayment charge.